UNITED STATES DISTRICT COURT
FOR THE COMMONWEALTH OF MASSACHUSETTS

DEBORAH KELLY                                )
                         Plaintiff,          )
v.                                           )          DOCKET NO.: 05 10750 REK
                                             )
PAUL DONNELLY, MICHAEL BYERS, SGT.           )
KEITH JACKSON, OFFICER JOHN DOE, in their    )
individual and official capacities, and the TOWN )
OF ROCKLAND, MASSACHUSETTS,                  )
                                             )
                         Defendants.         )
_____)

## DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN
## SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, defendants Paul Donnelly

("Donnelly"), Michael Byers ("Byers"), Keith Jackson ("Jackson"), John Doe ("Doe") and the

Town of Rockland (the "Town") submit the following statement of undisputed facts in support of

their accompanying motion for summary judgment as to the claims of the plaintiff, Deborah

Kelly, for use of excessive force, negligence, negligent supervision, and violation of 42 U.S.C., §

1983.

### Statement of Undisputed Facts

1.      On April 20, 2002, George Stoddard ("Stoddard") was the owner of residential

property located at 51 Wilson Street in Rockland, Massachusetts.  Deposition of George

Stoddard, **Exhibit A**, at 6.

2.      On April 20, 2002, the plaintiff, Deborah Kelly ("Kelly"), was living at the

Stoddard residence with Mr. Stoddard.  Deposition of Deborah Kelly, **Exhibit B**, at 8.

3.      Since approximately 1997 or 1998, Stoddard had been involved in an ongoing dispute with one of his neighbors, Louis Rubbo ("Rubbo"), regarding the ownership of a strip of land between their respective properties. **Exhibit A**, pp. 9-10; **Exhibit B**, p.10.

4.      Before April 20, 2002, the Rockland Police Department had been called to intervene in disagreements between Stoddard and Rubbo over this issue on more than thirty occasions. **Exhibit A,** p. 73.

5.      On Saturday, April 20, 2002, Kelly parked her pickup truck on the side of the driveway between Stoddard's and Rubbo's homes that is adjacent to Rubbo's home. **Exhibit B,** pp. 14-16.

6.      The following morning, Sunday, April 21, 2002, Stoddard noticed that all four of the tires on Kelly's truck were deflated, and that the valve stems on the tires had been pulled out and bent. **Exhibit A,** p. 30.

7.      Stoddard drove to a hardware store to purchase replacement stems and, after returning, installed the stems and reinflated the tires. While Stoddard was doing so, Rubbo confronted him and demanded that he move Kelly's truck from the driveway. **Exhibit A,** p. 30.

8.      After reinflating the tires on Kelly's truck, Stoddard went to a coffee shop. When he returned approximately two hours later, he discovered that the tires on Kelly's truck had been flattened again. **Exhibit A,** p.30. At this time, Stoddard exchanged words with Rubbo regarding Kelly's truck being parked in the driveway, and Rubbo threatened to call a tow truck to remove Kelly's truck if it was not moved. **Exhibit A,** pp. 31-32.

9.      After this exchange, Stoddard and Kelly began working in Stoddard's yard. While they were working, at approximately 1:00 to 1:30 p.m., a tow truck arrived at the house.

–2–

**Exhibit A,** p. 32.

10      Stoddard spoke to the tow truck driver and maintained that the driver did not have

the right to tow Kelly's truck, following which the driver appeared to indicate that he would

leave.  **Exhibit A,** p. 33.

11.      Stoddard then saw Rubbo speaking on his cellular phone.  Approximately 15 to 20

minutes thereafter, two police cruisers arrived at the scene.  **Exhibit A,** pp. 34-35.

12.      Stoddard spoke for a time with the police officers who had arrived, including

Officer Paul Donnelly.  **Exhibit A,** pp. 36-38.  Officer Donnelly indicated to Stoddard that, based

on the fact that the driveway is located in front of Rubbo's garage, it appeared to him that the

driveway was Rubbo's property.  **Exhibit A,** pp. 43-44.

13.      Stoddard then spoke with Kelly, who was working in the back yard of Stoddard's

house, and told her that her truck was going to be towed if she refused to move it.  **Exhibit A,** p.

43-44; **Exhibit B,** pp. 21-24, 27.

14.      Kelly went to the front of the house with Stoddard and spoke with another of the

police officers who had arrived, Officer Michael Byers.  **Exhibit A,** pp. 38-39.  Officer Byers

confirmed to Kelly that if she did not move her truck from the driveway within three or four

minutes, it would be towed.  **Exhibit A,** p. 39, **Exhibit B,** p. 24-25.

15.      Kelly then walked over to her truck, opened the door and entered the vehicle.

**Exhibit A,** p. 41; **Exhibit B,** p. 28.  After starting the engine, she backed up the truck from the

driveway onto the lawn in front of Stoddard's house.  **Exhibit B,** pp. 28-30; **Exhibit A,** p. 45-48.

16.      Officer Donnelly, who was adjacent to the truck, shouted to her that she was

under arrest and directed her to exit her truck.[1]  **Exhibit A,** p. 47; Deposition of Richard Somers,

**Exhibit C**, pp. 18-19.

17.     Kelly did not immediately exit her truck in response to Officer Donnelly's order.

**Exhibit C,** p. 19.

18.     When Kelly failed to exit her truck, Officer Donnelly broke the window of the

driver-side door of the truck with his police baton so that he could unlock and open the door.

**Exhibit C,** p. 19-20; **Exhibit A,** p. 47.

19.     While this was happening, Stoddard went into his house.  **Exhibit A**, p. 49;

**Exhibit B**, p. 32.

20.     When Officer Donnelly broke the window of the truck, Kelly exited her truck

through the passenger-side door and ran into Stoddard's house.  She closed the door behind her,

without locking it.  **Exhibit B**, p. 32; **Exhibit A,** p. 50.

21.     The defendants, Officers Donnelly and Byers and Sergeant Jackson pursued Kelly,

opened the closed door and entered the house. **Exhibit B,** p. 32; **Exhibit C,** p. 21.

22.     According to Kelly, the officers "put[] [her] to the ground and bang[ed] [her] head

on the floor." **Exhibit B**, pp. 32-35.

23.     Kelly testified that the officers told her to hold her hands out where they could

secure them, but Kelly claims that because she was lying face down, she could not free her

hands. **Exhibit B**, p. 35.

---

[1] The defendants assert that Kelly disobeyed their direction to stay off of Ruffo's property and that she then recklessly struck Officer Donnelly while moving her truck, which was the reason that Donnelly informed Kelly that she was under arrest. Kelly disputes this allegation. As set forth in the defendants' accompanying memorandum of law, however, this factual dispute is immaterial to the grounds upon which the defendants seek summary judgment.

24.    Kelly claims that, after she was arrested and handcuffed, the officers lifted her off the ground to her feet, causing her shirt to be pushed or pulled up, exposing her breasts. Complaint, ¶¶ 18-19.

25.    Someone, whose identity was unknown to Kelly, pulled her shirt down to cover her breasts. **Exhibit B**, pp. 36-37.

26.    Kelly does not allege that any of the defendants struck her during the course of her arrest. **Exhibit B.**

27.    While Kelly was being arrested, Officer Somers was involved in a physical altercation with Stoddard in the same room. **Exhibit A**, pp. 52-54; **Exhibit C**, pp. 23-25, 45.

28.    Kelly resisted the officers' efforts to restrain her and to place her under arrest.[2]

29.    Kelly was charged by the Rockland Police Department with trespassing; assault and battery with a dangerous weapon; assault and battery upon a police officer; and resisting arrest. **Exhibit B**, pp. 45-46.

30.    On January 28, 2003, after a trial, Kelly was convicted of trespassing and resisting arrest. **Exhibit B**, pp. 45-46.

31.    Kelly's complaint does not assert any facts regarding any deficiency in the training provided to members of the Rockland Police Department with respect to the use of force against citizens.

---

2 The Rockland officers claim that Kelly was kicking her feet and clutching her arms in front of her to avoid being handcuffed. Kelly was convicted in Hingham District Court of resisting arrest. As discussed in the Memorandum of Law in support of their Motion for Summary Judgment, the defendants maintain that, because of her conviction, Kelly is collaterally estopped from denying that she resisted arrest.

Respectfully submitted,

The Defendants
By their attorneys,

PIERCE, DAVIS & PERRITANO, LLP


/s/ Jeffrey M. Sankey
Jeffrey M. Sankey, BBO #551062
Ten Winthrop Square
Boston, MA 02110
(617) 350-0950
jsankey@piercedavis.com


**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 8, 2006.


/s/ Jeffrey M. Sankey
Jeffrey M. Sankey

# EXHIBIT A

GEORGE STODDARD
May 28, 2004

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2                 DISTRICT OF MASSACHUSETTS
 3                   C.A. NO: 03-10461-DPW
 4
 5      * * * * * * * * * * * * * * * * * * *
 6      GEORGE STODDARD,                        *
 7                     Plaintiff                 *
 8      vs.                                      *
 9      RICHARD SOMERS, in his personal          *
10      and official capacity, and THE          *
11      TOWN OF ROCKLAND, MASSACHUSETTS,        *
12                     Defendants                *
13      * * * * * * * * * * * * * * * * * * *
14
15               DEPOSITION OF GEORGE STODDARD
16              PIERCE, DAVIS & PERRITANO, LLP
17                    Ten Winthrop Square
18                   Boston, Massachusetts
19               May 28, 2004     10:50 a.m.
20
21
22
23                  Maryellen Coughlin
24            Registered Professional Reporter
```

GEORGE STODDARD
May 28, 2004

Page 2

1  APPEARANCES:
2
3  Representing the Plaintiff:
4      WHITFIELD SHARP & SHARP
5      196 Atlantic Avenue
6      Marblehead, Massachusetts 01945
7      BY: Daniel S. Sharp, Esq.
8      (781) 639-1862  (781) 639-1771
9
10 Representing the Defendants:
11     PIERCE, DAVIS & PERRITANO, LLP
12     Ten Winthrop Square
13     Boston, Massachusetts 02110
14     BY: Brian D. Carlson, Esq.
15     (617) 350-0950  (617) 350-7760
16
17
18
19
20
21
22
23
24

Page 3

1           I N D E X
2
3  WITNESS:   GEORGE STODDARD
4
5  EXAMINATION:            Page
6  MR. CARLSON             4
7  MR. SHARP               86
8
9
10
11 EXHIBITS FOR IDENTIFICATION:
12 No.    Description       Page
13 1  Statement of Mr. Stoddard   75
14
15
16
17
18
19
20
21
22
23
24

Page 4

1           P R O C E E D I N G S
2
3        MR. CARLSON: I will put on the
4  record Mr. Sharp and I have agreed all
5  objections, except as to form, will be reserved
6  until time of trial. Mr. Stoddard may read and
7  sign the transcript under the pains and
8  penalties of perjury within 30 days after
9  receiving it, and we'll waive the requirement of
10 signing it in front of a notary.
11
12        GEORGE STODDARD,
13 having been first duly sworn, was examined
14 and testified as follows:
15
16        EXAMINATION
17 BY MR. CARLSON:
18     Q.    Mr. Stoddard, I'm Brian Carlson
19 representing the Town of Rockland and Richard
20 Somers, as you know. Have you been deposed
21 before?
22     A.    Who?
23     Q.    Have you been deposed before? Have
24 you ever had a deposition taken?

Page 5

1     A.    Yeah. I don't think for this,
2  though.
3     Q.    Okay. In what type of case did you
4  give a deposition previously?
5     A.    A suit that I had pending.
6     Q.    What kind of lawsuit?
7     A.    Yes.
8     Q.    What kind of lawsuit?
9     A.    Oh, it has to do with -- what kind
10 of lawsuit. I don't know.
11        MR. SHARP: Well, it's a property
12 dispute with Louis Rubbo, R-U-B-B-O.
13        THE WITNESS: But it goes deeper
14 than that.
15     Q.    Well, I'm sure that Mr. Sharp has
16 explained the process to you, but I just want to
17 go through a few reminders because this is a
18 little bit different process than we usually
19 appear in. If you would just give me a chance to
20 finish my questions before you begin answering so
21 the court reporter can take everything down, that
22 would be helpful. If I ask a yes/no question,
23 please be sure to say "yes" or "no" and not nod
24 or say "mm-hmm" or something like that.

CATUOGNO COURT REPORTING SERVICES
Springfield, MA   Worcester, MA   Boston, MA   Providence, RI   Manchester, NH

GEORGE STODDARD
May 28, 2004

**Page 6**

1    If you don't understand a question,
2  just let me know and I will try to rephrase it.
3  If you need to change or clarify an answer at any
4  point, just let me know and you can do that. You
5  will have a chance, as I just said, to review the
6  transcript afterwards and make any necessary
7  corrections to it.
8    If your counsel makes any
9  objections to a question that I raise, you can go
10  ahead and answer, unless he specifically tells
11  you not to answer, that will just give us the
12  chance to discuss it later on if we need to.
13    And finally, if you need to take a
14  break at any point, just let me know. I just ask
15  if I've asked a question you answer it before you
16  take a break.
17    A.    Mm-hmm.
18    Q.    So with that, let me just ask you
19  if you can give your address?
20    A.    51 Wilson Street, Rockland,
21  Massachusetts 02370.
22    Q.    And how long have you lived there?
23    A.    Oh, I've been there since '96 or
24  '97. Somewhere around there I moved into the

**Page 7**

1  house.
2    Q.    Where were you living before then?
3    A.    Hanover, Hanson.
4    Q.    Can you summarize your education
5  for me?
6    A.    Just to the 12th grade, didn't
7  graduate.
8    Q.    Did you go through any votech
9  courses?
10    A.    Southshore Vocational Technical
11  High School in Hanover.
12    Q.    What kind of field?
13    A.    Carpentry.
14    Q.    And did you get a certificate from
15  there?
16    A.    No.
17    Q.    What years did you attend that?
18    A.    Well, let's see, I was suppose to
19  graduate in '74.
20    Q.    Okay. And maybe I could just ask,
21  what is your date of birth?
22    A.    4/22/55.
23    Q.    Are you currently employed?
24    A.    No.

**Page 8**

1    Q.    When were you last employed?
2    A.    Other than a day here and there,
3  May of 2003.
4    Q.    Were you employed as a carpenter?
5    A.    Yes.
6    Q.    Who was your employer?
7    A.    M.F. Reynolds.
8    Q.    And where is that located?
9    A.    Medford. It was high-end
10  construction.
11    Q.    Now, you said you purchased your
12  current home in 1996 or 1997?
13    A.    The papers were signed over in '99.
14  I was living in there a couple years before.
15    Q.    Did you purchase it from a family
16  member?
17    A.    Yes.
18    Q.    I see. Now, when you first moved
19  in 1996 or 1997, did Louis Rubbo live next door
20  at that time?
21    A.    Yes, he did.
22    Q.    Do you know when he moved into that
23  house?
24    A.    1982 he purchased it. No, wait a

**Page 9**

1  minute. I think it was '82 he purchased his
2  house.
3    Q.    Okay. Now, as you know, this
4  lawsuit comes in large part from a dispute you
5  had with Mr. Rubbo over the boundaries of your
6  respective properties. I'm just wondering, when
7  did you first become aware that there was an
8  issue or a dispute as to where the property line
9  was?
10    A.    Years back I remember my
11  grandmother saying that Louis Rubbo had taken
12  part of Elmer Gilfeather's land, and I didn't
13  give it much thought. I was younger then.
14    And I was in the house for a while,
15  and I would say hi to Lou Rubbo, and he would
16  stick his nose up, drive his bike back and forth
17  and not even acknowledge me. So this went on for
18  let's say a couple of years.
19    So finally I saw him in the gas
20  station, and I walked up to him and said, "Do you
21  have a problem with me? You know, I say hi to
22  you, and you stick your nose up at me. You don't
23  like me or what, what's the problem?" And he
24  says, "Yeah, I have a problem with that. Your

3 (Pages 6 to 9)

GEORGE STODDARD
May 28, 2004

Page 10

1  house is on my property." He says, "I'll give
2  you a few dollars so that my lawyers don't tear
3  you apart and you'll have something in your
4  pocket, 'cause I know you don't have anything."
5  And I said, "Geez, I don't know." He says,
6  "Well, tell me what you want for it?" He said,
7  "Your grandmother said she wanted 50,000 but
8  that's way too much." So I said, "I don't know,"
9  I says, "I will have to think about it and get
10  back to you, but as far as it being yours, I'm
11  going to have to look into it."
12       Q.    Did he say whether he thought that
13  all of your house was on his property?
14       A.    Oh, yes --
15       Q.    All of it was?
16       A.    -- my house was on his property.
17            MR. SHARP: He said?
18            THE WITNESS: Yes, quote.
19       Q.    Had your grandmother or any other
20  relative ever told you that Rubbo had made a
21  similar claim to them?
22       A.    No. No, I don't know what happened
23  between him and Gilfeather. I can't even imagine
24  the torment that Gilfeather went through, and he

Page 11

1  was 70, 80 years old. I can't even imagine.
2  With what I'm going through now, I can't even
3  imagine what he was going through.
4       Q.    Gilfeather is the person who owned
5  the house --
6       A.    Yes.
7       Q.    -- before your family built it or
8  moved into it?
9       A.    It was handed down.
10       Q.    I see.
11       A.    My grandfather was best friends
12  with him, and it was given to my grandfather and
13  grandmother. And when my grandfather died, my
14  grandmother had it, and then she sold it to
15  me for a dollar.
16       Q.    I see. So for a time you lived
17  with both your grandparents in the house?
18       A.    Not at that house, no. I was at
19  their house. I was living in the basement at
20  their house for two years.
21       Q.    Okay.
22       A.    And my sister wanted to get me out
23  'cause she wanted to take over my grandmother's
24  house, so they passed this house off to me. I

Page 12

1  didn't want it. I didn't even want it because I
2  knew there was such a mess.
3       Q.    Is your grandmother still living?
4       A.    Yes, she's in a nursing home in
5  Rockland.
6       Q.    I see. When did she move out of
7  the house?
8       A.    She didn't have any choice. I
9  think she was picked up and carried out.
10       Q.    When was that, if you remember?
11       A.    Oh, I'd say within the last year,
12  year and a half.
13       Q.    Now, when you moved in in 1996 or
14  1997, did Mr. Rubbo have the garage that's at
15  issue here?
16       A.    Oh, yes.
17       Q.    It had been built?
18       A.    Yes.
19       Q.    Do you know when it was built?
20       A.    1984. Wait a minute, wait a
21  minute. No, no, correction. 1987.
22       Q.    And your grandparents told you
23  that?
24       A.    No.

Page 13

1       Q.    How did you learn that?
2       A.    I researched.
3       Q.    You researched?
4       A.    Researched that, years and years of
5  research. Let's say two, three years. It's
6  ongoing.
7       Q.    Now, what did you do after you had
8  that conversation with Mr. Rubbo where he said
9  that your house was on his property?
10       A.    Well, we started -- my friend,
11  which is my roommate now, and I started doing
12  research.
13       Q.    This is Ms. Kelly you're referring
14  to?
15       A.    Yes, Ms. Deborah Kelly. And we
16  would go to the registry of deeds and this and
17  that and get all the papers, and we found out
18  there was a big mess there. We found out that a
19  lot of the pieces of land on the street had been
20  in land court, and then we found out that this
21  one had been in superior court for the other
22  side.
23       Q.    Can you clarify that for me a bit?
24       A.    Well, the garage that was here was

4 (Pages 10 to 13)

GEORGE STODDARD
May 28, 2004

Page 14

1  originally on the other side of the house.
2      Q.   So the garage had been moved?
3      A.   Right.
4      Q.   And that was in 1987 it was moved?
5      A.   It was moved in 1987, yeah. I'm
6  not sure of the dates on the court. The courts
7  ordered him to move it.
8      Q.   And what did you conclude from the
9  research you did?
10      A.   You mean that I know now?
11      Q.   Right, what did you conclude after
12  you did research as to where the property line
13  was?
14      A.   It's hard to explain in one little
15  piece, but what I concluded was that there's two
16  lots of land beside me which the papers say I
17  own. The town has it. They took it away for
18  nonpayment of taxes. My house is on the land
19  that Rubbo has title to that says he owns, and
20  his house is on a lot that just got lost in the
21  paperwork and on another lot that was taken over
22  by somebody else. Do you see what I'm saying?
23      Q.   So it seems kind of confusing, but
24  the documentation seems inconsistent?

Page 15

1      A.   Right, and to anybody that doesn't
2  know -- I know more about that street than
3  anybody on that. Anybody that doesn't know they
4  can get confused. And that you can ask Dan.
5  He'll confirm it.
6      Q.   Okay. Have you ever --
7      MR. SHARP: Off a second.
8      MR. CARLSON: Sure.
9      (Discussion off the record.)
10      MR. CARLSON: Let me just put on
11  the record Mr. Sharp is kindly putting together a
12  sketch of the property, and I'm sure he will let
13  Mr. Stoddard take a look at it and make sure that
14  he agrees with it, and I will try my best to
15  understand it.
16      THE WITNESS: It boils down to
17  three things anyway.
18      MR. SHARP: Hold on a second.
19      THE WITNESS: All right.
20      MR. SHARP: I think if you just
21  tell Mr. Carlson who owns which lot --
22      THE WITNESS: Are you going to
23  number those?
24      MR. SHARP: No, then it will get

Page 16

1  too confusing, but that's your house
2  (indicating), that's the garage (indicating),
3  that's Rubbo's house (indicating), that's the
4  swamp (indicating).
5      MR. CARLSON: Sure, if you could
6  just label that with perhaps names.
7      MR. SHARP: And who you believes
8  owns what based on your research.
9      THE WITNESS: You don't have this
10  drawn up right, though.
11      MR. SHARP: Well, you redo it,
12  then.
13      THE WITNESS: All right, let's see.
14  It consists of six lots.
15      MR. CARLSON: Could you also draw
16  where the street is and where the driveway that's
17  at issue here is, so I can understand that the
18  best I can.
19      THE WITNESS: This is the street,
20  Wilson Street (indicating). The squiggly lines
21  just indicate -- oh, shoot, I screwed that up, so
22  I can't say that.
23      MR. CARLSON: You can correct it.
24      THE WITNESS: Okay. Now, where did

Page 17

1  you want the garage, where it was or where it is?
2      MR. SHARP: Where it is.
3      THE WITNESS: Okay, where it is.
4  You're asking me to do three years of research in
5  one piece of paper. Let me make sure I'm not
6  screwing this up. Don't pay attention to the
7  numbers, that's just for me, 'cause it will get
8  confusing.
9      Okay. This is Wilson Street
10  (indicating). Off the top of my head north or
11  south, I don't know, but I do have drawings that
12  have all of that. This is parcel 42 which I have
13  documentation that says that I own it.
14      MR. CARLSON: Okay.
15      THE WITNESS: The town took this
16  over in 1982 for nonpayment of taxes, owner
17  unknown, so they didn't do a title search. My
18  house is on parcel 43 --
19      MR. CARLSON: Okay.
20      THE WITNESS: -- which consists of
21  two lots, and these are the corrected lot
22  numbers.
23      Q.   Okay. And the middle thing is the
24  garage?

CATUOGNO COURT REPORTING SERVICES
Springfield, MA   Worcester, MA   Boston, MA   Providence, RI   Manchester, NH

GEORGE STODDARD
May 28, 2004

Page 18

1    A.    Right.
2    Q.    Okay.
3    A.    So basically what I'm saying I own
4    is this, right in here (indicating).
5    Q.    And Mr. Rubbo says the line is here
6    (indicating)?
7    A.    Well, that's where the line is, but
8    that line splits my property in half.
9    Q.    Mm-hmm.
10    A.    Not according to the paperwork,
11    according to what I have to go into court and
12    prove.
13    Q.    Okay.
14    A.    Because my deed says that I own
15    this (indicating).
16    Q.    Okay.
17    A.    His deed says that he owns this
18    (indicating).
19    Q.    Mm-hmm.
20    A.    Now, when his deed was written up,
21    and I have a plot plan that shows it, the deed
22    and the plot plan -- okay, the deed lists that
23    he's on 43 and 39, which made this 43 and 39 on
24    his plot plan, but in reality, this is 35 and 31,

Page 19

1    not 43 and 39.  And if this was 43 and 39, then
2    my house would be on 51 and 47.
3    Q.    Mm-hmm.
4    A.    So on goes the dispute where he put
5    his garage.
6    Q.    Okay.  We'll get back to this.
7    A.    It goes into more than that.  It
8    goes into I have no where to park.
9    Q.    Okay.  Why don't I get back to this
10    in just a second.
11    A.    All right.
12    Q.    A few more questions, then I'll
13    probably ask you to refer to that again.
14    A.    If it's all right with the lawyer,
15    if you have any requests I can give you whatever
16    you need on paperwork as far as that goes.
17    MR. CARLSON:  Okay.  Well, I'll
18    look into that.
19    Now, when was the first time that
20    police were called to intervene in a dispute
21    that you were having with Mr. Rubbo over this
22    issue?
23    A.    I have no idea.  The first time, I
24    have no idea.

Page 20

1    Q.    Can you estimate about how many
2    years after you owned the house?  I don't want
3    you to guess, but if you could just give me your
4    best estimation.
5    A.    If I give an estimation, then I
6    would be perjuring myself.  I don't know.
7    Q.    All right, all right.  Do you
8    remember the first occasion on which the police
9    were called?
10    A.    To the best of my recollection, it
11    was the time that they came down and took the
12    plates off of Kelly's truck.  See, right now you
13    got me digging, digging back.  I have it
14    documented.
15    Q.    So somebody took the license plates
16    off of Kelly's truck?
17    A.    Yeah, the Rockland Police
18    Department took them off.
19    Q.    Do you know who called them to do
20    that?
21    A.    To take the plates off, no.  But
22    who called them, it wasn't myself.
23    Q.    Okay.  What happened when the
24    police came to take the plates off?

Page 21

1    A.    I'm trying to think, 'cause there
2    was a time that I got stuck in the ribs.  Off the
3    top of my head, I can't remember.  It was so long
4    ago, and there's been so much going on.
5    Q.    When is the first time you can
6    remember that the police were called because you
7    and Mr. Rubbo were having an argument?
8    A.    I remember one time that Officer
9    Doranzo came over, and I forget what the dispute
10    was between Louis Rubbo and I.  It had do with
11    parking the car, I guess, beside the house, and
12    he wanted the car off of his property.
13    Q.    So you were having an argument with
14    him outside of your houses?
15    A.    Yeah.  Well, he would damage the
16    car and do whatever he wanted to do.
17    Q.    Did you call the police at that
18    time?
19    A.    If I had called the police in all
20    the times that things have been going, it might
21    be three, four, five times.
22    Q.    You've called the police three or
23    four times?
24    A.    Well, I myself probably two or

6 (Pages 18 to 21)

GEORGE STODDARD
May 28, 2004

Page 22

1  three, and Deborah Kelly a couple times.
2      Q.    How many other times have they come
3  besides when you called them?
4      A.    Louis Rubbo, he probably called
5  them maybe 30 times.
6      Q.    So you're thinking that maybe
7  around 35 times total the police have come to
8  deal with this situation?
9      A.    I would say that would be a close
10  assumption.
11      Q.    Okay.
12      A.    It's nothing you can hold me to,
13  but I would say it would be close.
14      Q.    Now, obviously we're going to be
15  talking a lot about the incident on April 21st,
16  2002, today. I want to ask you, in all the times
17  prior to that when the police came, was there
18  ever a time when a police officer conducted
19  himself or herself in a manner that you thought
20  was inappropriate, threatening, violent, or
21  anything like that?
22      A.    I can say yes. My life may be at
23  risk, then. I don't know.
24      Q.    Can you describe what you mean?

Page 23

1      A.    I was told -- first, I was jammed
2  in the ribs, and I was told "You're an
3  instigator, park your fucking vehicle over
4  there."
5      Q.    Do you remember when that was?
6      A.    That was probably one of the first
7  times that the police came over.
8      Q.    Do you know which police officer it
9  was who --
10      A.    I don't know his name, but I know
11  him, yes.
12      Q.    Was it one of the officers who came
13  on April 21st, 2002?
14      A.    It was one of the officers that
15  took the plate off of Kelly's truck, but I never
16  called the police to report that.
17      Q.    What I'm asking is, the officer who
18  elbowed you in the ribs, was that one of the
19  officers who came on April 21st, 2002, to deal
20  with the argument?
21      A.    No, no. He works night shift.
22      Q.    Okay. Now, other than the time
23  that you just talked about when an officer
24  elbowed you and swore at you, was there any other

Page 24

1  time where you had a problem with the way that an
2  officer behaved when intervening in this dispute?
3      A.    Other than the day?
4      Q.    Other than that day.
5      A.    No. Not that I can recall. I
6  would say no.
7      Q.    Okay. Now, moving to April 21st,
8  2002, that incident --
9      A.    It was the day before my birthday,
10  by the way.
11      Q.    How was it that Ms. Kelly's car
12  came to be parked in the driveway that's in
13  dispute that day?
14      A.    Where she normally parks Mr. Rubbo
15  had blocked.
16      Q.    Can you show me that on this
17  diagram?
18      A.    All right. We were parking the
19  cars right here (indicating).
20      Q.    So you would park your --
21      A.    And he blocked here. Now, what
22  goes on is this is -- well, see, it's not really
23  part of the lot. It's really out here. This is
24  town owned because the town owns 40 feet.

Page 25

1      Q.    Forty feet of the street?
2      A.    Yeah.
3      Q.    Okay. All right, if I can just try
4  to make this a little clear for the record. Tell
5  me if I'm being accurate here. It looks like
6  what you're saying is that Kelly would usually
7  park her car in a driveway right adjacent to your
8  house, but that this time Mr. Rubbo had parked
9  his car horizontally on the edge of the driveway
10  partially in front of your house --
11      A.    Right.
12      Q.    -- and blocking her?
13      A.    She would park right here
14  (indicating), because we had the Volvo here
15  (indicating), and she would park right here
16  (indicating).
17      Q.    So you would park your cars in
18  tandem usually?
19      A.    Yeah. We had nowhere else to park
20  them, except maybe further down the street.
21      Q.    And what is next to where you park
22  your cars, is that another part of the driveway?
23      A.    What is next to -- well, let's say
24  his driveway comes through like this

7 (Pages 22 to 25)

GEORGE STODDARD
May 28, 2004

Page 26

1  (indicating).
2      Q.   Okay.  So his driveway takes up the
3  whole space from his house out to the street,
4  essentially?
5      A.   Pretty much.  It takes up the whole
6  lot which is 4,000 square feet.
7      Q.   Okay.  And it's narrow enough, I
8  take it, then, that when he put his car out on
9  the street there was no room to, like, pull
10  forward and back around, so it really was
11  blocked?
12      A.   No, because he had ties and stuff
13  here (indicating).  He had a car here
14  (indicating).
15      Q.   So he also had stuff in the
16  driveway, okay.
17      A.   We had trees here which one time --
18  that was probably one of the first episodes, now
19  that you mention it -- when Kelly was parked
20  there -- as a matter of fact, we have a picture
21  of it -- and Louis Rubbo drove over the hump and
22  parked his truck right smack dab right up beside.
23  Now, that time we had to call the police.  The
24  police came down, Rubbo couldn't move his truck,

Page 27

1  spinning the tires, spinning the tires.  And this
2  was Officer Doranzo that had come down that time.
3  I don't know if a police report was filed.  I'm
4  sure there was.  And basically what ended up
5  happening was the officer made Deborah Kelly move
6  her truck which meant that she had to run over a
7  tree that we had on the front lawn.
8      Q.   Is it legal to park in the street
9  outside of either of these houses?
10      A.   When it is not snowing.
11      Q.   Is it typically crowded when it is
12  not snowing?  Is it difficult to find a space to
13  park on the street?
14      A.   No.  But the point on that is he
15  has this whole driveway.  He also has in front of
16  his house if he wants to park --
17      Q.   Okay.
18      A.   -- but he chooses to aggravate me.
19      Q.   Now, what happened after you found
20  that Kelly's car had been blocked in by Rubbo's
21  truck?
22      A.   Well, I would say a couple times --
23          MR. SHARP:  On which occasion?
24          MR. CARLSON:  I'm returning to the

Page 28

1  April 21st, 2002, incident.
2      A.   Oh, well, she had nowhere to park,
3  so she parked it in the driveway.
4      Q.   She parked in his portion of the
5  driveway?
6      A.   No.  In his alleged driveway, yes.
7      Q.   Okay.
8      A.   She had nowhere else to park.
9      Q.   Okay.  And then what happened after
10  that?
11      A.   It sat there -- well, let me see.
12      Q.   I'm sorry, if I can just clarify
13  too.  Was that on April 21st, that Sunday, or was
14  it actually the day before?
15      A.   No, it was probably two or three
16  days before that.
17      Q.   Okay.
18      A.   And the cops were called, I don't
19  remember by who, and they came down, and they
20  said there was nothing they could do.
21      Q.   Did you speak to them when they
22  came?
23      A.   Do you know how hard this stuff is
24  to remember, especially with all the stuff going

Page 29

1  on?
2      Q.   Do you think that either you or
3  Kelly spoke to them?
4      A.   At different times, yeah, because
5  when they would talk to him they would come over.
6  They would get a complaint from him, and then
7  we'd have to tell them why.
8      Q.   But on this occasion that we are
9  talking about here when she put her car in the
10  driveway 'cause there wasn't any other space, do
11  you remember whether you or Kelly or both of you
12  talked to the police when they came?
13      A.   Oh, a couple of times.
14      Q.   But this time specifically.  The
15  first time they came after she had put her car or
16  put her truck in Rubbo's alleged driveway.
17      A.   The first couple days, yes, and
18  they said there's nothing we can do, so she left
19  the vehicle there.
20      Q.   Who did they say that to, to you?
21      A.   No, Rubbo wanted it towed out, and
22  I said, "We'll move the vehicle when you move
23  your truck and she can park there," because she
24  has no where else to park.

8 (Pages 26 to 29)

GEORGE STODDARD
May 28, 2004

Page 30

1    Q.    And were the police there when you
2 had that conversation with Rubbo?
3    A.    No, this was a couple times I had
4 said that to him.
5    Q.    Okay.
6    A.    So I guess that morning I got up
7 and all four tires were flat.
8    Q.    So this is the morning of April
9 21st?
10    A.    Yes. So I got my compressor, and I
11 went over to fill up the tires, and all the valve
12 stems had been pulled out and bent. So I went
13 down to the hardware store, got some valve stems,
14 put them in and was out there pumping up the
15 tires, and Rubbo comes out and starts harassing
16 me, "Get that fucking truck . . ." So I just
17 pumped up the tires, and I went somewhere, I
18 think it was to the coffee shop, and I came back
19 and all the tires, three of the tires were flat
20 again.
21    Q.    How long was that after you had
22 pumped them up?
23    A.    Oh, maybe two hours.
24    Q.    And then what happened after you

Page 31

1 came back and saw that the tires were flat again?
2    A.    There might have been words between
3 the two neighbors.
4    Q.    I'm sorry, say that again, please.
5    A.    I said there might have been words
6 between the two neighbors.
7    Q.    Between you and Rubbo, you mean?
8    A.    Yeah, like "Move your F'ing truck
9 off my property."
10    "I told you I'm going to move it
11 when you move that."
12    Q.    Do you remember anything else that
13 you said to him or he said to you either when you
14 first noticed that the tires were flat or when
15 you saw that they were flat again?
16    A.    You mean did I flip out and want to
17 beat him up, no.
18    Q.    But do you remember anything else
19 that was said? If you don't, I understand.
20    A.    No, I don't.
21    Q.    Okay.
22    A.    I mean, this has been so ongoing
23 and every day -- I'm telling you, it's not one
24 day this week, one day next week. Every single

Page 32

1 day I have to put up with something, so it's hard
2 to remember everything. It's especially hard --
3 and I'm not good with dates or numbers. It's
4 especially hard to put a date or a time. Now,
5 the only reason why the 21st sticks out in my
6 head is because that was the day before my
7 birthday, and it was a wonderful birthday
8 present.
9    Q.    Okay. So you came back, and you
10 saw the tires were flat again, you think you may
11 have spoken to Mr. Rubbo again briefly, what do
12 you remember doing after that?
13    A.    I was working on the yard.
14    Q.    And what happened while you were
15 working in the yard?
16    A.    And Kelly was working out in the
17 backyard cutting trees with the chain saw and
18 what not.
19    Q.    And then what happened?
20    A.    And then Rubbo had said something
21 about towing it. I said, "Fine," and the tow
22 truck came.
23    Q.    About what time of day was this the
24 tow truck came?

Page 33

1    A.    Somewhere around one o'clock, I
2 think, 1, 1:30. I didn't have a watch, so I
3 don't know.
4    Q.    Okay. Did you try to or think
5 about pumping the tires up again after you came
6 back the second time?
7    A.    No, because I already did it once.
8 I'm not going to do it again.
9    Q.    Okay. Were you thinking that it
10 was going to be Rubbo's responsibility to take
11 care of the tires 'cause you believed he'd done
12 it?
13    A.    Yeah.
14    Q.    And so what happened after the tow
15 truck came?
16    A.    I told the tow truck you can't
17 touch that vehicle. You move it, you're going to
18 be responsible, and we hemmed and hawed, and the
19 tow truck was ready to leave because, you know,
20 he doesn't want to get into this.
21    Q.    About how long was it before he
22 said he was ready to leave?
23    A.    How long was it before he said he
24 was ready to leave. I would say within a half

9 (Pages 30 to 33)

GEORGE STODDARD
May 28, 2004

Page 34

1  hour --
2  Q.  Okay.
3  A.  -- that we were having discussion.
4  Q.  Did you know the tow truck driver?
5  A.  No.  I don't know if Louie did,
6  though, but the tow truck driver was going to
7  leave.
8  Q.  Have you learned the name of the
9  tow truck driver since that day?
10  A.  No.  I'm sure it's on a report
11  somewhere.  To me it doesn't matter.
12  Q.  So what happened after the tow
13  truck driver said he was going to leave?
14  A.  Louie got on his phone.
15  Q.  Did you see him take his phone out?
16  A.  No.
17  Q.  Did he go into his house?
18  A.  I saw him just standing there
19  talking.
20  Q.  So he pulled his cell phone out?
21  A.  Mm-hmm.
22  Q.  Okay.
23  A.  I assume he pulled it out.  I saw
24  him standing there talking on it.

Page 35

1  Q.  Okay.  And after he apparently
2  called the police, two cruisers showed up, is
3  that right?
4  A.  It was two or three.
5  Q.  Okay.  About how long after you --
6  A.  Now, see, I don't know he called
7  the police.  The only reason I know he called the
8  police is 'cause they came.
9  Q.  Right, you're assuming that, and I
10  understand that.  About how long after you saw
11  him on his telephone did the police come?
12  A.  Geez, I don't know.  These are
13  tough questions.
14  Q.  Just your best guess.
15  A.  Fifteen, twenty minutes.
16  Q.  And you said you think that two or
17  three cruisers came?
18  A.  Well, I initially -- I heard
19  sirens, and I heard squealing tires, and I looked
20  up, and I see two cruisers come flying down the
21  street.
22  Q.  Had you gone back to your yard and
23  resumed your work?
24  A.  Well, I was in the front yard.  I

Page 36

1  mean, the area is so close.
2  Q.  Mm-hmm.
3  A.  And I went out and talked to Kelly,
4  and I said, "Geez, Kelly, the cops are here."
5  Q.  She was in the backyard at the
6  time?
7  A.  Yeah, cutting trees, not knowing
8  what's going on.
9  Q.  And then what happened after the
10  police came?
11  A.  Well, when the police were there,
12  they would talk to Rubbo, and then I went over
13  there, and there were, you know, words exchanged.
14  Q.  Did you hear what they said to
15  Rubbo or what he said to them?
16  A.  No, but they wanted the truck off
17  his property.  He says it's his property.  I said
18  it's in dispute.  I said I have paperwork that
19  shows that I own it, blah-blah-blah and so on and
20  so on, and I said let me run in and get it.
21  Q.  Let me just back up for a second.
22  Did you know any of the officers who showed up
23  first?
24  A.  No, no.

Page 37

1  Q.  Since you probably have learned the
2  names of them since then, do you remember now
3  which officer you were talking to, to whom you
4  said I have paperwork that shows that I own the
5  property?
6  A.  Yeah, it was Officer Donnelly.
7  Q.  It was Officer Donnelly?
8  A.  Mm-hmm.
9  Q.  And what did Officer Donnelly say
10  to you when you said that?
11  A.  He looks at it, and then he says,
12  "Well, we have nothing to do with that, that's a
13  civil matter."  I said, "Fine."  I said,
14  "Where's, you know --
15  Q.  And what was the other officer
16  doing when you were talking to Mr. Donnelly or
17  Officer Donnelly about that?
18  A.  Officer Byers.
19  Q.  And what was he doing at the time,
20  if you noticed?
21  A.  We were all kind of in a
22  argument --
23  Q.  So the two officers --
24  A.  -- myself, and I assume the two

10 (Pages 34 to 37)

GEORGE STODDARD
May 28, 2004

Page 38

1   officers and the tow truck driver.
2       Q.    So you were all basically together
3   talking about this?
4       A.    Yeah.
5       Q.    Was Rubbo in on that conversation?
6       A.    He's standing off to the side, but
7   initially he was.
8       Q.    Do you remember what he said?
9       A.    No, other than "I want this F'ing
10  truck off my property."
11      Q.    Do you remember anything else that
12  Officer Donnelly said right at that time?
13      A.    Not at that time, no.
14      Q.    Do you remember anything that
15  Officer Byers said?
16      A.    Not at that time, no.
17      Q.    So what happened next after Officer
18  Donnelly said he didn't want to look at your
19  papers and it was a civil matter.
20      A.    Then I went out back and got Kelly.
21  I said, "Kelly, the cops are here," and I said,
22  "They're trying to tow your truck." So she came
23  over and had a few words with Byers, I guess
24  that's his name.

Page 39

1       Q.    And do you remember what she said
2   to him?
3       A.    She said something to the fact that
4   she didn't have to move her truck and that it was
5   a civil matter and not and I don't know.
6       Q.    Do you remember what he said in
7   response, if anything?
8       A.    He had said that he wanted the
9   truck moved, and there was mention of a certain
10  time limit to move it.
11      Q.    And what time limit did he say?
12      A.    He said three or four minutes to
13  make up your decision. "If you don't move it,
14  we're going to tow it."
15      Q.    And what happened after that?
16      A.    Well, we decided it wasn't going to
17  be, she wasn't going to move it, and then they, I
18  guess -- I didn't see all that was going on
19  because I wasn't watching behind me.
20      Q.    Did you tell the officers we're not
21  going to move it?
22      A.    Yeah.
23      Q.    And then what happened?
24      A.    And then I said to Kelly, "They

Page 40

1   gave you four minutes." I said, "It's up to
2   you." I said, "The tires" -- well, I did tell
3   them that we were not going to move the truck
4   unless the tires were pumped up by Rubbo and he
5   moved his vehicle so she had a place to park.
6       Q.    Okay. And what happened after you
7   told the police that?
8       A.    They were going to tow it, and I
9   said to Kelly, "Well, it's up to you whether you
10  move it or not."  -
11      Q.    And then what happened?
12      A.    And at this time Rubbo peeled off
13  and moved his truck down.
14      Q.    He pulled it on to the street?
15      A.    I assume. I didn't see everything
16  that was going on behind me.
17      Q.    So just at some point you noticed
18  that Rubbo had moved his truck on to the street?
19      A.    Right.
20      Q.    And what was the tow truck doing at
21  this time?
22      A.    From the sound of it, it was
23  backing up.
24      Q.    Did you think that he was getting

Page 41

1   ready to hook up Kelly's truck and tow it?
2       A.    I would assume, yeah, because I
3   could hear it beeping.
4       Q.    Okay. And what happened after
5   that?
6       A.    To the best I remember, Kelly
7   decided she was going to move her truck. The
8   officer gave her the last chance, so she went
9   over to her truck to get in, and one of the
10  officers, Donnelly, said -- now, this is from
11  behind me -- "Stop, you're under arrest." She's
12  in the vehicle, starts it up.
13      Q.    Was she in the truck yet when you
14  heard the officer say that?
15      A.    Yeah, yeah. And then automatically
16  when you start it up, the radio comes on.
17      Q.    Was the door open to the truck when
18  the officer said that?
19      A.    No. She was up and in it, and the
20  best I can remember is that Donnelly came running
21  over.
22      Q.    Was that the first time any of the
23  officers had said that she was under arrest?
24      A.    Yes, and she never even knew it.

11 (Pages 38 to 41)

GEORGE STODDARD
May 28, 2004

Page 42

1 She had decided to move her truck in that
2 allotted time.
3     Q.    No, prior to that.  Prior to Kelly
4 getting into her truck to move it, had any of the
5 officers told you or Kelly to move off of what
6 they thought was Rubbo's driveway?
7     A.    Yeah.
8     Q.    When did that happen, as best you
9 can remember?
10     A.    I was on the dirt, I think it was,
11 when we were having the discussion.
12     Q.    The dirt is what the police
13 believed to be Rubbo's property?
14     A.    Yeah.  And now that I think of it,
15 it was town property, is what it was.
16     Q.    Okay.
17     A.    Originally I was on the driveway
18 with all of them, and then I had backed over, and
19 then I was by my car.
20     Q.    Did one of the officers say that
21 you and Kelly had to move because you were
22 trespassing?
23     A.    I think it was Officer Donnelly who
24 told me, "If you don't get off the property, I'm

Page 43

1 going to arrest you."  And me, I just backed
2 down.
3     Q.    So then you moved on to your land
4 when he said that?
5     A.    I just stepped one step over, one
6 or two steps over.
7     Q.    Was Kelly next to you at that
8 point?
9     A.    I don't remember.
10     Q.    Do you remember if --
11     A.    I think she was leaning against the
12 Volvo which was right there (indicating), was
13 right here (indicating).
14     Q.    Okay.
15     A.    I think I need to go to the
16 bathroom when we get a break.
17     Q.    Why don't we do it right now.
18     A.    All right.
19         (A break was taken.)
20     Q.    Now, when the officers told you to
21 move off of, move off of the driveway back on to
22 your own property, did they tell you why they
23 thought you were trespassing, did they tell you,
24 you know, we think this is Rubbo's land?

Page 44

1     A.    That was mentioned, but all the
2 other times it was a civil matter.
3     Q.    So on this occasion one of the
4 officers --
5     A.    From what I see -- oh, that's
6 correct, you remind me now.  When Donnelly looked
7 at the papers he said, "Well, from what I see" --
8 and I guess if you look at it you could assume
9 that -- "this is Mr. Rubbo's property, so get off
10 or I'm going to arrest you for trespassing."
11     Q.    And it seemed that way to him
12 because you were standing in front of Rubbo's
13 garage?
14     A.    Yeah.
15         MR. SHARP:  Objection.
16     A.    Alleged garage.
17     Q.    I understand.  What happened after
18 Kelly got into her car, got into her truck and
19 closed the door?
20     A.    Now, I'm standing there, and I
21 can't believe what I'm seeing.  I'm kind of
22 dumbfounded by this time.  From the time I was
23 told that I would be arrested for trespassing, I
24 backed off.  But I remember somebody running up

Page 45

1 from behind me when they said you're under
2 arrest.  Not to me.  I was doing absolutely
3 nothing.  I wasn't moving the vehicles.  I was
4 just standing there like this (indicating).  And
5 Kelly puts it in reverse, backs up, and because
6 the tire is flat, the tire will spin in the dirt,
7 and she pulled it over right next to the porch on
8 the front, what you would call the lawn.
9     Q.    In front of your house?
10     A.    Yeah.
11     Q.    Okay.  When you heard the policeman
12 say you're under arrest, do you remember whether
13 Kelly had started her engine at that point?
14     A.    It was all in the same motion.
15     Q.    So it's hard to remember exactly?
16     A.    I know she didn't hear him.  I know
17 she didn't hear him.
18     Q.    And then what happened?
19     A.    And her truck is exceptionally loud
20 when you start it up, and then the radio.
21     Q.    And then what happened after she
22 backed her truck up in front of the porch?
23     A.    As far as --
24     Q.    Just the next thing you remember, I

12 (Pages 42 to 45)

GEORGE STODDARD
May 28, 2004

Page 46

1    guess.
2        A.    Officer Donnelly was at the truck.
3        Q.    Where was he standing?
4        A.    To the best of my knowledge, at the
5    door.
6        Q.    The driver's side door?
7        A.    Yeah.
8        Q.    Did you hear him say anything?
9        A.    That I don't remember.
10       Q.    Did you see him doing anything?
11   Was he pounding on the window or anything like
12   that, the window of the truck?
13       A.    I don't even remember that either,
14   whether he was knocking on the window or not.
15       Q.    What's the next thing you do
16   remember after you saw him by the driver's side
17   door?
18       A.    I remember once she was backing
19   up -- now, keep in mind I'm standing on the
20   middle of the lawn right now.  When she was
21   backing up I heard, "You're under arrest,"
22   blah-blah, and then I heard, "All right, that's
23   it," and Donnelly hit the mirror with his elbow,
24   and then where he went from there I don't know.

Page 47

1    Kelly's vehicle moved in front, and I'm standing
2    still.  I'm standing let's say right here
3    (indicating), and the truck is here (indicating),
4    and one of the officers said, "Don't you move."
5    I'm standing there like this (indicating),
6    dumbfounded.  I can't believe what I'm seeing.
7    "Get out of the truck, you're under arrest."  And
8    she looks up.  I'm assuming she's scared to
9    death.  So he hit the window a couple times with
10   his hands.  He couldn't do anything, and then he
11   pulled out his baton, and he missed the window,
12   hit the top of the ledge, and then the next I see
13   the window shatter, and Kelly is crying her eyes
14   out, and from that point I was in my house.
15       Q.    If I can just go back for just a
16   second.  I think you said that after she
17   initially backed the truck up in front of the
18   porch at some point she pulled it forward again?
19       A.    Mm-hmm.
20       Q.    And she pulled it forward into the
21   place that she usually parks in --
22       A.    No, no.  She pulled it right on to
23   the property so that there was no question, right
24   in front of the house, not on town property, not

Page 48

1    on disputed property.
2        Q.    Okay.  So she moved it into the
3    area that Rubbo had been blocking?
4        A.    Yeah, by that.
5        Q.    By that?
6        A.    Right.
7        Q.    So to the left of it if you're
8    looking from the street?
9        A.    If you're looking from the
10   street -- even more than you normally would have
11   it.
12       Q.    Okay.  How far did she move it
13   forward, about?
14       A.    Oh, let's see.  The lot is 40 feet.
15   This had to be 15, 20 feet.
16       Q.    Did you notice how long it took her
17   to move it forward?
18       A.    No, I didn't have a watch.
19       Q.    Was she moving quickly, slowly?
20       A.    You mean did she speed?
21       Q.    Well, I'm assuming she wasn't going
22   55 miles an hour, but I'm just wondering if she
23   was going very slowly or normal speed for pulling
24   in a driveway?

Page 49

1        A.    Just moving it, normal with flat
2    tire.
3        Q.    Okay.
4        A.    Well, one tire was pumped up and
5    the other one, the one that does the traction was
6    the one that was flat.
7        Q.    Okay.  And so after you saw the
8    policeman break down the window, you said you
9    went into your house at that point?
10       A.    Yeah.
11       Q.    And what were you going into your
12   house to do?
13       A.    Believe it or not, I was going in
14   to call the cops.
15       Q.    And what happened next?
16       A.    And then when I got in there, I
17   can't call the cops, that's the cops out there.
18   So the next thing I remember is Kelly coming
19   through the door.  I turned around, and the next
20   thing I remember was getting hit in the face and
21   slammed to the ground over a bookcase and saying
22   "Don't you move."  I have no idea who it was that
23   hit me.
24       Q.    Maybe we can just break this down a

GEORGE STODDARD
May 28, 2004

Page 50

1  little more slowly.  Now, you went into your
2  house, did you close the door when you went in?
3      A.      Yeah.
4      Q.      And about how long after you went
5  in did Kelly open the door and come in?
6      A.      Oh, Geez, I'd say it was a matter
7  of -- it had to be seconds.
8      Q.      Ten seconds?
9      A.      Thirty, tops.
10     Q.      Did she close the door when she
11  came in?
12     A.      Yeah, I remember her closing the
13  door.
14     Q.      Did she lock it?
15     A.      And you figure you close the door
16  you're safe inside your house.
17     Q.      Did she lock the door did you
18  notice?
19     A.      That I don't remember.
20     Q.      Now, how did the police open the
21  door?
22     A.      Whether they turned the knob or
23  not, that I don't know.
24     Q.      Okay.

Page 51

1      A.      I could hear banging and pushing,
2  but I was turned the opposite direction.
3      Q.      Okay.
4      A.      This happened so quick.
5      Q.      You may have noticed this
6  afterward, I assume you did, did they break any
7  of the hinges of the door or did they leave any
8  marks in the door itself?
9      A.      No, there was a dent on the door,
10  and the door itself has got a split.  It's still
11  there.  It has a split where the backset sits.
12     Q.      Where was the dent on the door?
13     A.      Down at the bottom.
14     Q.      So it may have looked like somebody
15  kicked it?
16     A.      Yeah, but keep in mind my deck was,
17  my porch was under construction, so there was two
18  by sixes and a couple of pieces of plywood
19  sitting on there.
20     Q.      How big was the dent?
21     A.      Oh, maybe the size of a baseball.
22     Q.      So about an inch?
23     A.      Yeah, the edge of a baseball
24  hitting it.  Maybe not even that.  A quarter of

Page 52

1  inch deep maybe.
2      Q.      A quarter of an inch into the wood,
3  you have a wood door?
4      A.      No, it's a metal door.
5      Q.      Metal door.
6      A.      But metal door with wood where the
7  backset gets cut in.
8      Q.      I see.  So wood is on the outside
9  of it?
10     A.      No, wood is on the inside, and it's
11  metal outside.
12     Q.      I see, I see.  So after you heard
13  the officers come inside the house, about how
14  long was it until you were hit?
15     A.      It was all instantaneous.
16     Q.      So within just a few seconds?
17     A.      Yeah.  I didn't know nothing was
18  going on.  Now, what I can't get over is that
19  when I was outside watching what was going on at
20  the truck, one of the officers had put his hand
21  up and said "Don't move."  What am I going to do?
22  You know, don't come towards them.  So I made no
23  forward advancement on them.  I walked around and
24  went in the house.

Page 53

1      Q.      Where were you hit exactly, on your
2  forehead, on your cheek?
3      A.      Right in here (indicating).
4      Q.      So near your chin?  If you can just
5  describe it as best you can.
6      A.      It happened so quick.  I remember
7  getting hit and then slammed.
8      Q.      It's just because we can't get a
9  gesture recorded.  I was wondering if you could
10  just verbalize the best you can where you were
11  hit on your face?
12     A.      Right on my chin.
13     Q.      Right on your chin.  Was it with a
14  fist?
15     A.      Or an open hand.  I don't remember.
16     Q.      There wasn't a baton or another
17  weapon or anything?
18     A.      Oh, no, no.
19     Q.      Did you fall over when you were
20  hit?
21     A.      No.  I didn't have time to fall
22  over.  I was helped over.
23     Q.      So you were tackled down after you
24  were hit?

14 (Pages 50 to 53)

GEORGE STODDARD
May 28, 2004

Page 54

1    A.    No, I was grabbed and slammed. I
2  don't weigh a lot. I weigh 150 pounds. This guy
3  weighs double what I weigh.
4    Q.    So really your being punched and
5  taken down was kind of part of the same motion?
6    A.    It was all instantaneous. And I
7  looked up, and there's Rick Somers, "Don't you
8  fucking move."
9    Q.    So you were taken down on to your
10  back?
11    A.    Right. Well, I was on a bookcase
12  first, like this, with my ankles (indicating),
13  and I looked up, and I saw it was Rick Somers,
14  and I said, "Rick, what did you do that for?"
15    Q.    And Rick Somers is another Rockland
16  police officer?
17    A.    Yes.
18    Q.    And he lives on your street?
19    A.    Yes.
20    Q.    Were you acquainted with him before
21  this?
22    A.    Oh, yes, hi and bye, and he'd go
23  into the donut shop where I use to hang around.
24  So as far as I knew, he was the nicest officer I

Page 55

1  ever met, the nicest guy in the world.
2    Q.    Would you have called him a friend
3  or just an acquaintance?
4    A.    An acquaintance. It was definitely
5  somebody I didn't dislike, till now. I don't
6  have much care for him.
7    Q.    How far away from the door of the
8  house were you when Officer Somers took you down?
9    A.    My house is not very big. Five or
10  six feet.
11    Q.    Did you see what was happening with
12  Kelly right before you were hit?
13    A.    No. After I was on the ground, I
14  did see something.
15    Q.    So what did you see after you were
16  taken down and saw that it was Rick Somers?
17    A.    Oh, I had said -- I asked him what
18  he did that for, and he says, "Oh, we're sick of
19  your shit." Now, keep in mind, this is a guy
20  that I thought, you know, had no ill feelings
21  against me. "We're sick of your shit." And I
22  said, "Why, what did I do?" And something about
23  coming down here and blah-blah this. You know,
24  talk goes into the station, talk gets around.

Page 56

1    Q.    At this point he was still holding
2  you against a bookcase?
3    A.    Oh, yeah.
4    Q.    How tall is this bookcase you're
5  talking about?
6    A.    I'd say -- well, the bookcase is
7  laying on the floor now. The bookcase is
8  probably --
9    Q.    Four feet tall, would you say?
10    A.    Yeah, it's about that height.
11    Q.    So when he took you down he knocked
12  you over on top of the bookcase --
13    A.    Yeah, and I was kind of --
14    Q.    -- and knocked the bookcase over
15  too?
16    A.    -- on it with it in my back, and he
17  was holding me (indicating).
18    Q.    Okay. So I take it the bookcase
19  was against a wall and he kind of pushed you --
20    A.    No, no. We were moving stuff
21  around.
22    Q.    Okay.
23    A.    We had just brought a refrigerator
24  in there, and we were moving stuff around.

Page 57

1    Q.    I see. Was the bookcase empty of
2  books?
3    A.    Yeah.
4    Q.    And what do you remember next after
5  you had that conversation with him while you were
6  on the bookcase?
7    A.    Well, I remember seeing -- oh, let
8  me see. I remember them saying to Kelly, "You're
9  under arrest." This is after they're inside the
10  door. There was one or two of them inside, and
11  somebody was outside standing. I don't know if
12  they were on the ground, but they looked awful
13  short, so maybe the plywood moved or something.
14  I don't know why it would move, though.
15    Q.    And what's the next thing you
16  remember happening?
17    A.    I remember Kelly screaming for me
18  to help her. I said, "I can do nothing."
19    Q.    And you were still on the bookcase
20  at that point?
21    A.    Yeah.
22    Q.    And was Somers holding you down?
23    A.    He was holding me down, and I see
24  Kelly on the floor and Somers kicking her feet as

15 (Pages 54 to 57)

GEORGE STODDARD
May 28, 2004

Page 58

1 he's holding me down, so he's trying to hold her
2 feet down.
3     Q.    How was he holding you down, did he
4 have you by a shoulder?
5     A.    No, he had me by the sweater that I
6 had on, right here (indicating).
7     Q.    Okay. Was he putting force on your
8 chest when he was holding you by your sweater?
9     A.    Yeah, I was squished between him
10 and the bookcase.
11     Q.    And then what happened next?
12     A.    I'm being held down, and finally --
13 well, I'm not sure what's going on, but finally
14 he let me up, as they were taking her out.
15     Q.    Can you give me your best estimate
16 as to how long he was holding you down?
17     A.    I would say anywheres from a minute
18 and a half to three minutes.
19     Q.    Was he physically preventing you
20 from getting up?
21     A.    I wasn't even trying to get up.
22     Q.    You were staying down because it
23 was clear to you he wanted you there?
24     A.    Yeah. Well, I mean, I was

Page 59

1 dumbfounded. I had just been knocked off my
2 feet, not that it would have phased you, you
3 know. So did I rush up, no. As soon as I was
4 let up, then I would get up, yes.
5     Q.    Were you at all dazed or confused
6 as a result of having been hit?
7     A.    That's what dumbfounded means. I
8 was confused from watching what I saw outside
9 because I didn't experience anything like that
10 before.
11     Q.    Did you feel dizzy or that you
12 weren't sure that you were perceiving what was
13 going on because you had been hit in the face or
14 did you feel that you could understand what was
15 going on even though it was hard to see a reason
16 for it?
17         MR. SHARP: I'm not sure I
18 understand.
19     Q.    Should I clarify?
20         MR. SHARP: Are you asking was it
21 emotional or physical?
22     Q.    I guess what I'm saying is
23 sometimes when people are hit in the face or the
24 head, they can feel, like, a little bit faint or

Page 60

1 dizzy?
2     A.    Well, no, I didn't have trauma. I
3 didn't have trauma, no.
4     Q.    Okay. And so when Somers
5 finally --
6     A.    That I know of, 'cause I don't know
7 if my personality has changed or not from that.
8     Q.    Now, when Somers let you up, what
9 was the first thing you saw?
10     A.    Him.
11     Q.    Somers?
12     A.    Standing in front of me, yeah.
13     Q.    Did you speak to him at that point?
14     A.    Not at that point, no.
15     Q.    Did he say anything to you?
16     A.    I might have said, "What's going to
17 happen to her?" I know I had said this at one
18 time, and he said, "Oh, she'll be taken down the
19 station, and you can come down and bail her out."
20     Q.    Had she been taken out of the house
21 by the time he let you up?
22     A.    Yeah, I don't know whether I was on
23 me feet or not.
24     Q.    Did you --

Page 61

1     A.    I would say no because I guess I
2 was considered a threat. Why, I have no idea.
3     Q.    I think you said that while Somers
4 was holding you down you saw him trying to hold
5 Kelly's foot down or something like that. Did
6 you notice anything else about how the police
7 were trying to place her under control or under
8 arrest?
9     A.    I seen them have her shoulders
10 down, and her arms were pinned under her, 'cause
11 they were trying to get them, her arms, and
12 Somers was kicking her foot down, and I don't
13 know if they got her arms before they lifted her
14 up or not.
15     Q.    Did you see whether she was
16 struggling?
17     A.    Now, would I struggle if my arms
18 were under me and there was people jumping on my
19 back? How do I answer that. Did I see her
20 struggling, yes.
21     Q.    What was she doing, exactly, if you
22 can remember, if you can just describe it in
23 words the best you can.
24     A.    Squirming around and her feet was

16 (Pages 58 to 61)

GEORGE STODDARD
May 28, 2004

Page 62

1　moving.
2　　　Q.　So her feet and shoulders were
3　squirming?
4　　　A.　Yeah.  Her feet weren't moving bad.
5　They were just up like this (indicating).
6　　　Q.　And she was on her back at that
7　point?
8　　　A.　No, she was on her stomach.
9　　　Q.　She was on her stomach.  So her
10　hands were under her stomach and against the
11　floor?
12　　　A.　Yeah, she was like that
13　(indicating).
14　　　Q.　And it looked like the police were
15　trying to pull her hands behind her back so they
16　could handcuff her?
17　　　A.　Yeah, they're doing this while
18　they're telling her to let her arms out, and I
19　would say it's awful hard to get your arms out
20　with -- she's got to weigh, oh, I'd say, and
21　don't tell her this, probably 170, and Donnelly
22　has got to weigh 250, and the other officer has
23　to weigh at least what I weigh, I'd say better,
24　so all that weight on top of you.

Page 63

1　　　Q.　By the way, about how big is Rick
2　Somers?
3　　　A.　Which way?
4　　　Q.　Height and weight.
5　　　A.　Height, I'd say he's about this
6　much (indicating).
7　　　Q.　And you're how tall?
8　　　A.　Higher than me.  I'm five nine.
9　　　Q.　So he may be five eleven or so?
10　　　A.　I don't know.  I know he's a little
11　taller than I am and a little wider than I am and
12　probably weighs more than I do.
13　　　Q.　How much do you weigh, if you don't
14　mind?
15　　　A.　Oh, 155, pushing it.
16　　　Q.　Do you think Somers might weigh
17　175, thereabouts?
18　　　A.　I'd say he probably weighs close to
19　200 pounds.
20　　　Q.　So he's a pretty stocky guy?
21　　　A.　Well, he's more belly.
22　　　Q.　Okay.
23　　　A.　Then his belly was sticking out.
24　　　Q.　Now, when Somers came over, I take

Page 64

1　it that he wasn't in uniform?
2　　　A.　No.
3　　　Q.　He was off duty?
4　　　A.　Mm-hmm.
5　　　Q.　Did he say --
6　　　A.　I assume he was off duty.
7　　　Q.　Did he say anything like, you know,
8　I'm a policeman too --
9　　　A.　No.
10　　　Q.　-- or did he not mention anything
11　like that?
12　　　A.　I didn't even know who it was until
13　I looked up.  I never saw him come at me.
14　　　Q.　How was he dressed, if you
15　remember, just generally?
16　　　A.　I can't even remember that.
17　　　Q.　Now, you said that -- was it Somers
18　who told you you can come down and bail Kelly out
19　later on?
20　　　A.　He said that she would be down the
21　station, and that I could come down and probably
22　bail her out, and then I reconfirmed that with
23　the chief outside or the sergeant outside later
24　on.

Page 65

1　　　Q.　Did you have any other conversation
2　with Somers that you can remember?
3　　　A.　I had -- after I was up, let me
4　see, I called my friend Joe, and I told him that
5　they arrested Kelly and I didn't know what to do
6　　　Q.　This is your friend Joe, is it
7　Chitick?
8　　　A.　Joe Chitick.
9　　　Q.　Do you remember anything else from
10　your conversation with him?
11　　　A.　No, 'cause he didn't know what to
12　tell me.
13　　　Q.　And so after Somers told you you
14　can come down and bail her out later on, you
15　don't remember saying anything else to Somers or
16　his saying anything else to you?
17　　　A.　Well, I went outside.  Now, keep in
18　mind, I'm under the assumption that he didn't
19　think I was a bad guy, and it was always hi and
20　bye.  You know, I thought he was the nicest guy
21　in the world.  I really liked him.  And I went
22　out, and I said, "Rick, what did you do that
23　for?"  And I says, "What did I ever do to you," I
24　said, "other than" -- and he said something

GEORGE STODDARD
May 28, 2004

Page 66

1   about -- I can't remember at that time --
2   actually, I had said, I guess, "You said you're
3   sick of my shit, what did I ever do to you?" And
4   he said something about that's Louie's property.
5   And I said, "What are you telling me that's
6   Louie's property?" He said, "The judge told him
7   to put the garage there." And I had said to him,
8   "You're going to stand there and tell me that a
9   judge told him to put his garage on a piece of
10  property that he does not have proof of
11  ownership?" And Rick said, "Ah, no, I guess
12  you're right. And I said, "You say you're sick
13  of my shit, the last I remember I had my
14  surveyors down here to survey out the property,
15  you had come out and talked to them and sent them
16  away." I said, "What was that about?" I was
17  paying them, not him. I was paying them. As a
18  matter of fact, they were all paid. I got my
19  money back because they didn't want to get
20  involved.
21     Q.   So you're saying that Somers sent
22  surveyors away at some point?
23     A.   No, no. Somers, while I'm paying
24  the surveyors, he's having a half hour discussion

Page 67

1   with the surveyors at the time they were sent
2   over when they're suppose to be surveying the
3   land, and well, I got a letter later on saying
4   that we couldn't do it, blah-blah, and a note and
5   giving me my money back. It's too screwed up.
6     Q.   Do you remember anything else that
7   Somers said to you or you said to him that day?
8     A.   That was it.
9     Q.   Have you spoken with Rick Somers
10  since then?
11     A.   No. I see him a lot.
12     Q.   Do you --
13     A.   I see him a lot 'cause he works
14  down the courthouse.
15     Q.   Do you say anything more than maybe
16  just a hi?
17     A.   I don't say anything to him. I had
18  one time when I was in the court, the court for
19  the case, when Officer Donnelly said, "Hi, George
20  how are you doing?" "Hi," and that was it.
21     Q.   Now, I want to ask you, as a result
22  of his hitting you and taking you down, did you
23  have any physical wounds?
24     A.   I had a cut on my chin I was

Page 68

1   bleeding from.
2     Q.   About how big was the cut?
3     A.   I didn't get a picture of it
4   either. About a quarter of an inch.
5     Q.   A quarter of an inch long?
6     A.   (Witness nods.)
7     Q.   Did you see a doctor or go to the
8   hospital about it?
9     A.   No.
10     Q.   Did it stop bleeding after you put
11  a Band-Aid on it or something like that?
12     A.   Yeah, well, it did stop bleeding.
13  I wiped it off, and I went down to the donut
14  shop, and my friend said, "What happened to your
15  chin?" And I didn't want to get all into it
16  about Kelly being over there and I was waiting to
17  bail her out.
18     Q.   Had it stopped bleeding when you
19  saw your friend at the donut shop?
20     A.   I guess it was bleeding again. It
21  probably bled for a couple of hours and then
22  finally stopped.
23     Q.   Did you have any injuries anywhere
24  else as a result of having been pushed on to the

Page 69

1   bookcase?
2     A.   Not that I know, because my body is
3   pretty tough, but I'm getting older.
4     Q.   Did you need to see a doctor at any
5   point for anything resulting from this incident?
6     A.   Well, I needed to. Could I, no.
7     Q.   You didn't have medical insurance
8   at the time?
9     A.   I have it through my wife.
10     Q.   If you could just clarify what you
11  meant when you said I needed to, but I couldn't?
12     A.   I really couldn't afford it. Even
13  though I had the insurance, you still have --
14  what I'm talking about now is more mental --
15     Q.   I see.
16     A.   -- and my stomach, and it wouldn't
17  be something that they can take care of, you
18  know, overnight.
19     Q.   I see. So what you're saying is
20  that you might have considered having some kind
21  of --
22     A.   Break down.
23     Q.   -- counseling about this if you
24  could have afforded it?

18 (Pages 66 to 69)

GEORGE STODDARD
May 28, 2004

---

Page 70

1     A.     But it's not just that situation.
2  It's the whole lump sum.
3     Q.     You've had some physical effects
4  from the memory of it?
5     A.     Yeah. How much does a person take
6  before they snap? I know I've heard of people
7  snapping. How much do they take before it
8  happens? You don't know when it happens. I
9  don't want to get to that point.
10    Q.     Mm-hmm.
11    A.     So I swallow it. I swallow it. I
12 take a lot. My problem with the neighbor is day
13 in and day out, and I have to sit there and take
14 it, and I literally gag and throw up. When the
15 cops come, I literally throw up, and I'm not a
16 chicken by nature. I have to take this because
17 if I don't -- well, here's a perfect example, my
18 neighbor will come over, and he'll harass and
19 harass and harass, and he'll say, "You're a
20 fucking pussy. If you had any balls, you'd hit
21 me by now."
22          Now, his main objective is to try
23 and get me to hit him. My main objective,
24 through my lawyer's advice, is to ignore him.

---

Page 71

1  It's awful hard to ignore. So I swallow it. I
2  keep it in, I keep it in, I keep it in. I
3  frigging pace. And this has to do a lot with
4  that too. I pace and pace and pace. I'll smoke
5  a pack of cigarettes in two hours and not even
6  know I did it. I'll pace, pace, pace.
7     Q.     So obviously --
8     A.     How do you know when you snap?
9     Q.     So obviously you're under a lot of
10 stress from this continuing confrontation?
11    A.     It's the whole thing, and believe
12 it or not, it's all related. It's not poor woe
13 is me. It's, like I told her earlier, I'm public
14 enemy number one. It doesn't pay any money, but
15 that's where I am. If it's not the cops, I'm
16 poisoned, all the neighbors, and not because of
17 what I did to them or what they see. It's
18 because of what -- my neighbor Mr. Rubbo goes in
19 blah-blah-blah, blah-blah-blah, this guy is
20 trying to steal my land, blah-blah-blah, and Rick
21 Somers happens to be one of those neighbors, and
22 his son lives across the street.
23    Q.     Had you been feeling this sort of
24 anxiety and frustration before this April 21st,

---

Page 72

1  2002, incident too?
2     A.     Yes, but not to the point that it's
3  now. I have to hide in my house. I mean, if I
4  come out and be a man and say back off or you're
5  going to be sorry, then I get a little relief,
6  but if I sit there and take it, it keeps coming,
7  keeps coming, keep digging. What else can I do,
8  what else can I do. It's not a fact that I go
9  over there. It's always him coming over here,
10 because he has the right to walk the sidewalk, he
11 has the right to go on that plot of land on this
12 side, he has the right to work here, look in my
13 windows. I'm crowded right in. And that
14 probably has -- it does have something to do with
15 it, and it doesn't have something to do with it,
16 with what we're talking about here.
17    Q.     Now, since this day, April 21st,
18 2002, I take it the cops have come again?
19    A.     Oh, constantly. They were there
20 last night.
21    Q.     Do you have any estimation of how
22 many times they've come or maybe how often
23 they've come on average in the last, is it about
24 two years?

---

Page 73

1     A.     I've already told you that.
2     Q.     About the last two years, though.
3     A.     It was all told. I put a number on
4  it. I would say 30 times, give or take.
5     Q.     I see. So when you said 30 --
6     A.     I don't know exactly.
7     Q.     So when you said 30 or 35 earlier,
8  you were talking about for the entire time until
9  today?
10    A.     Yeah, to the best of my knowledge.
11    Q.     Okay. Do you have an estimate of
12 how many times since April 22nd have been part of
13 those 30 or 35?
14    A.     Boy, you ask tough questions. How
15 is there a right and a wrong to that question?
16    Q.     You don't have to be precise. If
17 you would just give your best estimate, that's
18 all that you're asked to do, not guess but best
19 estimate?
20    A.     Fifteen, twenty, best guess.
21    Q.     I think you said a few items in
22 your home were damaged because of this.
23    A.     The microwave got stepped on.
24    Q.     Do you know how that happened?

---

19 (Pages 70 to 73)

GEORGE STODDARD
May 28, 2004

Page 74

1    A.    I have no idea. I just know
2    that -- it wasn't a big microwave, but I just
3    know that it got squashed.
4    Q.    Was that on the floor too, as part
5    of your moving?
6    A.    Well, we had been moving stuff,
7    right.
8    Q.    Okay. So at some point somebody
9    stepped on it?
10    A.    Yeah, it was no good.
11    Q.    And the coffee table, same thing?
12    A.    Well, we were using it for a
13    kitchen table, and the legs snapped right off.
14    Q.    Okay. Were you able to repair the
15    coffee table or microwave or did you have to
16    replace them?
17    A.    Got rid of it.
18    Q.    Okay. How much did it cost to
19    replace them?
20    A.    Well, my house is not that big. My
21    house is 20 by 18. I have a card table which I'm
22    using now.
23    Q.    Did you replace the microwave?
24    A.    I got one given to me.

Page 75

1    Q.    Okay. Did you miss any work
2    because of having been hit and tackled that day?
3    A.    Oh, because of the cut on my chin?
4    Q.    Yeah.
5    A.    No. Have I missed any work because
6    of this whole situation, yes.
7    Q.    Okay, I can understand that.
8    A.    Have I been out of work for three
9    years, pretty much. Off and on work. Got to go
10    to court this day, nobody wants to keep you. If
11    you're not there, you're only as good as when
12    you're there.
13    Q.    Have you been able at any point to
14    talk to a counselor or a psychologist or a
15    therapist about all of this stress, at any point
16    since this incident?
17    A.    No. My counsel or my therapist is
18    my cigarettes. I don't drink, thank God.
19        MR. CARLSON: I ask the court
20    reporter to mark this as Exhibit 1. I know you
21    have seen this before?
22        (Exhibit No. 1 was marked
23        for identification.)
24    Q.    Just for the record, this is a

Page 76

1    nine-page handwritten statement that says on the
2    top "On 20's of April, 20, 21, 22," and I'll just
3    have the witness look at it and just ask you if
4    you recognize that.
5    A.    I can tell you right now I
6    recognize it 'cause I wrote it.
7    Q.    Now, when did you write this?
8    A.    The exact date is probably maybe a
9    week after. I had to wait until I calmed down.
10    Q.    What motivated you to sit down and
11    write that?
12    A.    That's the only means of release
13    that I have. I'm not going to the gym now, so.
14    And when you start writing -- and also, I'm
15    advised by my lawyer to write --
16    Q.    Oh, I don't want you to say
17    anything that your lawyer has told you.
18    A.    No, no, but I'm advised, whoever
19    that lawyer may be, to log everything.
20    Q.    Okay. Did you speak with Kelly or
21    with anybody else in the process of getting all
22    your recollections together and writing it down
23    or did you do it just from your own memory?
24    A.    You mean did she influence me? No,

Page 77

1    I was told I had to write. I said, "I will write
2    it when I'm ready. I can't do it right now."
3    Q.    I guess all I'm saying is when you
4    sat down and wrote that, did you --
5    A.    Was it by myself, yes. By myself
6    sitting in the corner.
7    Q.    So you wrote it just from your own
8    memory?
9    A.    Yes. From my own memory, yes.
10    Q.    You estimated 15 or 20 times that
11    the police have come to deal with the situation
12    with Rubbo and you since April 21st, 2002. Are
13    there any occasions in that time period where you
14    felt that the Rockland police have acted in a
15    hostile, inappropriate, violent manner toward
16    you?
17        MR. SHARP: Why don't we break that
18    down.
19    A.    You mean after that?
20    Q.    Yeah, right.
21    A.    No. All officers have been -- I
22    mean, they don't always want to tell you what you
23    want to hear, but they've been fairly polite.
24    They're doing their job, and they know it's a

20 (Pages 74 to 77)

GEORGE STODDARD
May 28, 2004

Page 78

1 volatile situation.
2      Q.    What is the current legal status?
3 I think you said that you may have litigation
4 ongoing right now over this whole property
5 ownership issue.
6          THE WITNESS:  Is it all right to
7 answer that?
8          MR. SHARP:  Sure.
9      A.    It's a lawsuit for the land as well
10 as -- you might be able to answer that better
11 than I can.
12          MR. SHARP:  Yes, but you have to
13 try to answer it.
14      A.    Harassment suit.
15      Q.    So you've filed a lawsuit against
16 Mr. Rubbo?
17      A.    Yes.
18      Q.    Is this in superior court?
19      A.    Yes.
20      Q.    Okay.
21      A.    It's mainly -- I'm more concerned
22 with getting back what's mine.
23      Q.    Maybe your lawyer could help you
24 correct this if the right terminology isn't so

Page 79

1 familiar for you.  Are you seeking to quiet title
2 to the land or to clear title?
3      A.    Clear title, yes.
4      Q.    Clear title, okay.
5      A.    As it stands right now, nothing can
6 be done.  It can't be sold.  I can't get a
7 mortgage on it.  How things have been sold in the
8 past, I don't know.
9      Q.    So you're asking the court to say
10 definitively this is where the line is?
11      A.    Well, I want them to see what is
12 what, not what documentation is showing.  It
13 boils down to this, the question is something is
14 wrong.  Now, is it a pencil error or did somebody
15 build the houses in the wrong place.
16      Q.    At what point is this lawsuit,
17 what's going on in the case right now?
18      A.    I think I'm waiting to redo my
19 deposition.
20      Q.    Okay.  So you're in discovery like
21 we're doing right now?
22      A.    I assume.  We sent them a letter,
23 and they haven't got back to us.
24      Q.    Okay.  So there hasn't been any

Page 80

1 court decision on this issue yet?
2      A.    I have no idea.
3      Q.    Okay.  Do you remember when you
4 started the lawsuit, when you filed the lawsuit?
5      A.    The date, no.
6      Q.    Was it within the last year?
7      A.    You're asking me dates that I pile
8 away.  I don't know.
9      Q.    Maybe I could just ask you, did you
10 file that lawsuit after April 21st, 2002?
11      A.    April 21st, that was the day of the
12 incident?
13      Q.    Right.
14      A.    I think so.
15      Q.    Okay.
16      A.    That's the best I can say.
17      Q.    Okay.
18      A.    I had no choice, for one thing, and
19 it has to be done.
20      Q.    Mm-hmm.
21      A.    Even if it comes out not the way
22 that I want it, it has to be done or this is
23 going to go on forever, and the police officer
24 time and time again, "You've got to get it into

Page 81

1 court to get this straightened out."
2      Q.    Okay.  Let me ask you, do you have
3 any knowledge about how the Rockland Police
4 Department might train its officers regarding
5 using force and what force is excessive?
6      A.    How would I?
7      Q.    You don't, then?
8      A.    No.  How would I?  I'm not a police
9 officer.  I haven't gone through the training.
10      Q.    A similar thing, you wouldn't have
11 any knowledge of how police might be trained in
12 how to conduct arrests?
13      A.    Well, I might have an answer to
14 this question, but maybe not what you're looking
15 for.  Do I think that the senior officers
16 influence, and I've seen it, the younger officers
17 that see things going one way and the officers
18 don't want it to go that way and they take the
19 kid aside and say something, yeah.  Do I think
20 there's influence on the older officers to the
21 younger officers, yes, I do.
22      Q.    But do you have any firsthand
23 knowledge of how officers are given training on
24 how to conduct arrests?

21 (Pages 78 to 81)

GEORGE STODDARD
May 28, 2004

Page 82

1    A.    Physical training, no.
2    Q.    In terms of policies. I mean, have
3  you seen any policy manuals, have you talked to
4  any police about what kind of training they
5  actually get and so on?
6    A.    (Witness shakes head.)
7    Q.    That's a "no"?
8    A.    No. I don't know how I would know
9  that.
10   Q.    Okay. Apart from this April 21st,
11  2002, incident and maybe also the time when you
12  said that Officer Doranzo, if I remember, elbowed
13  you in the ribs --
14   A.    No, no.
15   Q.    Did I get that wrong?
16   A.    Yeah. I don't know the name of the
17  officer that did it. It definitely wasn't
18  Doranzo.
19   Q.    Okay. Some officer elbowed you in
20  the ribs?
21   A.    Yeah, it was a motorcycle cop, big
22  one. His name I don't know. As a matter of
23  fact, he was over there last night, and he was
24  over there a couple of weeks ago.

Page 83

1    Q.    Okay. But apart from those two
2  incidents, do you know of any other incidents
3  involving you or other people in which you
4  believe Rockland police have used excessive
5  force?
6    A.    This is the second time you asked
7  me that question.
8    Q.    The first time I was just asking
9  you specifically. Now I'm talking about you or
10  anybody else, if you know of any other incidents
11  where --
12   A.    Since that time, no, no.
13   Q.    What about prior to it, do you know
14  of any other incidents involving other people
15  where you've heard or you believe the Rockland
16  cops may have used --
17   A.    Well, the time I got stuck in the
18  ribs with the elbow, and then years ago I had a
19  friend that was in McDonald's, and I think it
20  took eight or nine cops to drag him down. I
21  mean, I watched that.
22   Q.    What happened with that incident?
23   A.    The kid was a little smaller than I
24  was, and it took all nine of them to take him out

Page 84

1  in cuffs, carrying him.
2    Q.    What were they arresting him for,
3  if you know?
4    A.    Oh, I don't know. He might have
5  been on drugs or something. I was a teenager
6  then.
7    Q.    So that was decades ago?
8    A.    Yeah. Hey, decades?
9    Q.    I'm getting up there too, sir. If
10  we can just take a break for a few minutes, I'm
11  probably close to being done. I just want to
12  look over my notes and see if I missed anything.
13       (A break was taken.)
14   Q.    (By Mr. Carlson) I think I'll just
15  have a couple of more questions, and then, unless
16  Mr. Sharp wants to ask you anything, we will be
17  done and have you on your way. I may be covering
18  stuff we've gone over before, but I just want to
19  make sure that we're clear for the record.
20       After you went into your house and
21  closed the door and then Kelly came in and closed
22  the door and then the police came in after, was
23  there any break in time at all between the time
24  that the police came in and Somers hit you and

Page 85

1  took you down or can you really not separate
2  those events at all?
3    A.    It was instantaneous. I'd be
4  assuming Somers was the very first one in there.
5    Q.    Because you said you were standing
6  only five or six feet from the door?
7    A.    I was standing back too, and I just
8  turned around, that's how quick it was.
9    Q.    And then I think you said that
10  while you were being held down on the bookcase
11  and Kelly was on the ground too, you heard her
12  saying things like, "George, George, help me"?
13   A.    "Help me, help me."
14   Q.    Do you remember anything else that
15  she said?
16   A.    I remember her getting her head
17  slammed off of the threshold.
18   Q.    Do you remember her saying anything
19  else?
20   A.    What did they say. Oh, what did
21  they say. I remember them saying something to
22  her.
23   Q.    Do you remember her saying anything
24  else other than "George, help me"?

CATUOGNO COURT REPORTING SERVICES
Springfield, MA   Worcester, MA   Boston, MA   Providence, RI   Manchester, NH

GEORGE STODDARD
May 28, 2004

**Page 86**

1    A.   "Help me, George," and she was
2  crying.
3    Q.   She just said that over and over?
4    A.   Yeah.  "Help me.  How come you're
5  not helping me, helping me."  I said, "Well, what
6  am I going to do, Kelly?  Go quietly."
7    Q.   I think that's probably it for me.
8    A.   I said that a few times as they are
9  taking her out the door.
10    MR. CARLSON:  Do you have any
11  cross?
12
13          EXAMINATION
14  BY MR. SHARP:
15    Q.   Do you remember anything about
16  Kelly's blouse or shirt?
17    A.   Well, nobody asked me.
18    Q.   Right, but do you remember anything
19  about it?
20    A.   Yeah.  Well, I remember when they
21  finally got her up on her feet and they had the
22  handcuffs on her -- well, that's right too, she
23  was screaming that her shirt was above her chest
24  and the cops had lifted her up, and her shirt was

**Page 87**

1  still there.
2    Q.   That's all.
3    A.   And then I remember one of the
4  officers going "Wow."
5    MR. SHARP:  I think we're finished.
6    (Deposition concluded at 12:26 p.m.)

**Page 88**

1         C E R T I F I C A T E
2    I, Maryellen Coughlin, a Registered
3  Professional Reporter and Notary Public of the
4  State of Massachusetts, do hereby certify that
5  the foregoing is a true and accurate transcript
6  of my stenographic notes of the deposition of
7  GEORGE STODDARD, who appeared before me,
8  satisfactorily identified themself, and was by
9  me duly sworn, taken at the place and on the
10  date hereinbefore set forth.
11    I further certify that I am neither
12  attorney nor counsel for, nor related to or
13  employed by any of the parties to the action in
14  which this deposition was taken, and further
15  that I am not a relative or employee of any
16  attorney or counsel employed in this case, nor
17  am I financially interested in this action.
18    THE FOREGOING CERTIFICATION OF THIS
19  TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF
20  THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT
21  CONTROL AND/OR DIRECTION OF THE CERTIFYING
22  REPORTER.
23
24    MARYELLEN COUGHLIN, RPR

**Page 89**

1    UNITED STATES DISTRICT COURT
2    DISTRICT OF MASSACHUSETTS
3    C.A. NO: 03-10461-DPW
4
5  * * * * * * * * * * * * * * * * * *
6  GEORGE STODDARD,       *
7    Plaintiff     *
8  Vs.       *
9  RICHARD SOMERS, in his personal   *
10  and official capacity, and THE    *
11  TOWN OF ROCKLAND, MASSACHUSETTS,
12    Defendants    *
13  * * * * * * * * * * * * * * * * * *
14
15    I, GEORGE STODDARD, do hereby
16  certify, under the pains and penalties of
17  perjury, that the foregoing testimony is true
18  and accurate, to the best of my knowledge and
19  belief.
20    WITNESS MY HAND THIS ____ day of
21  _____, 2004.
22
23    _____
24    GEORGE STODDARD

23 (Pages 86 to 89)

GEORGE STODDARD
May 28, 2004

Page 90

1    Today's Date:    June 30, 2004
2    To:              Daniel S. Sharp, Esq.
3    Copied to:       Brian D. Carlson, Esq.
4    From:            Maryellen Coughlin, RPR
5    Deposition of:   George Stoddard
6    Taken:           May 28, 2004
7    Action:          Stoddard vs. Somers, et al.
8
9    ================================
10         Enclosed is a copy of Mr. Stoddard's
11   deposition. Pursuant to the Rules of Civil
12   Procedure, Mr. Stoddard has thirty days to sign
13   the deposition from today's date.
14         Please have Mr. Stoddard sign the
15   enclosed signature page. If there are any
16   errors, please have him mark the page, line, and
17   error on the enclosed correction sheet. He
18   should not mark the transcript itself. This
19   addendum should be forwarded to all interested
20   parties.
21         Thank you for your cooperation in this
22   matter.
23
24

24 (Page 90)

# EXHIBIT B

STODDARD V. SOMERS  CondenseIt™  DEBORAH ANN KELLY 7/6/04

**Page 1**

```
1                                    Page 1
2              Volume: 1
3              Pages: 1 to 50
               Exhibits:  None
4
       UNITED STATES DISTRICT COURT
5      FOR THE DISTRICT OF MASSACHUSETTS
            C.A. No. 03 10461 DPW
6
7      GEORGE STODDARD,           )
                Plaintiff         )
8                                 )
                                  )
9          vs.                    )
                                  )
10                                )
       RICHARD SOMERS, in his personal)
11     and official capacity, and )
       THE TOWN OF ROCKLAND,      )
12     MASSACHUSETTS,             )
                Defendant         )
13
14     DEPOSITION of DEBORAH ANN KELLY,
       a witness called on behalf of the
15     Defendant, pursuant to the applicable
       provisions of the Federal Rules of
16     Civil Procedure, before Judith R. Sidel,
       Professional Court Reporter and Notary
17     Public, in and for the Commonwealth of
       Massachusetts, at the Office of Pierce,
18     Davis, Perritano, LLP, 10 Winthrop
       Square, Boston, Massachusetts 02110-1257,
19     on Tuesday, July 6, 2004, commencing at
       10:15 a.m.
20
       APPEARANCES: (Continued on page 2)
21
22              * * * *
            SIDEL COURT REPORTING
23       Certified Shorthand Reporters
              35 Tudor Road
24        Needham, Massachusetts 02492
```

**Page 2**

```
1      APPEARANCES (Continued):
2
3      DANIEL S. SHARP, ESQUIRE
       WHITFIELD SHARP & SHARP
       196 Atlantic Avenue
4      Marblehead, Massachusetts 01945
          On behalf of the Plaintiff
5
6      BRIAN D. CARLSON, ESQUIRE
       PIERCE, DAVIS, PERRITANO, LLP
7      10 Winthrop Square
       Boston, Massachusetts 02110-1257
8         On behalf of the Defendant
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
1                                    Page 3
2
                     I N D E X
3
4      WITNESS        DIRECT CROSS REDIRECT RECROSS
5      Deborah Ann Kelly
       (By Mr. Carlson)   4
6
7                  E X H I B I T S
8      NO.       DESCRIPTION        PAGE
9      None
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

STIPULATIONS

It is hereby stipulated and agreed by and between counsel for the respective parties that the deposition will be read and signed under the pains and penalties of perjury. It is also stipulated that the notarization will be waived.

Failure to sign transcript within thirty (30) days will deem the signature waived.

It is further stipulated and agreed that all objections, except as to form, and motions to strike are reserved until the time of trial.

* * *

DEBORAH ANN KELLY, a witness called by counsel for the Defendant, upon production of driver's license, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CARLSON:

Q. Miss Kelly, just before we start, just

Page 5

1　　a few things.  Your attorney has probably
2　　explained them to you, but just to remind
3　　you, since this is sort of an artificial
4　　type proceeding.  Have you ever been
5　　deposed before?
6　A. What does that mean?
7　Q. Have you ever been in a deposition like
8　　this before?
9　A. I don't think so.
10　Q. If I could just ask you to let me finish
11　　each question before you begin answering;
12　　so that the court reporter can take
13　　down the questions and answers clearly,
14　　that would be appreciated, and if you
15　　can speak as clearly and as slowly as
16　　possible.  If you don't understand, as
17　　I said, any question that I ask, please
18　　just ask me to rephrase it.  If at any
19　　point you need to clarify or change an
20　　answer, just feel free to do that too.
21　　It's possible that Mr. Sharp may object
22　　when I ask a question.  Unless he tells
23　　you not to answer the question, you
24　　can go ahead and do that.  He's just

Page 6

1　　reserving his right to challenge it
2　　later on.  Finally, if you need to take
3　　a break to use the restroom, or talk
4　　to Mr. Sharp at any point, that's fine.
5　　I just request  that if I've asked a
6　　question,  you answer that before doing
7　　so.
8　A. Okay.
9　Q. If you could just state your current
10　　address?
11　A. 51 Wilson Street, Rockland,
12　　Massachusetts.
13　Q. How long have you lived there?
14　A. Since August of 1993.
15　Q. Where did you live previously?
16　A. 104 Elm Street in Marblehead,
17　　Massachusetts.
18　Q. Are you currently employed?
19　A. Yes, I am.
20　Q. Where are you employed?
21　A. I'm a hostess at TGi Fridays in Norwell.
22　Q. How long have you been employed there?
23　A. Since the end of February, beginning of
24　　March.

Page 7

1　Q. Of this year?
2　A. Yes.
3　Q. Were you employed previously to that?
4　A. Stop & Shop in Norwell.
5　Q. Can you briefly summarize your
6　　educational background beginning with
7　　high school?
8　A. I graduated from Mt. St. Joseph Academy
9　　in Rutland, Vermont.  Then I went on to
10　　the University of Vermont, and I have a
11　　degree in medical laboratory technology
12　　in 1971.
13　Q. And you graduated from high school in
14　　1971?
15　A. No, I graduated from college in 1971.
16　Q. What year did you graduate from high
17　　school?
18　A. '69.
19　Q. Do you have any further education?
20　A. You mean like going to school?
21　Q. Formal education.
22　A. Formal?
23　Q. Uh-huh.
24　A. I took a real estate course, but that's

Page 8

1　　about it.
2　Q. Did you practice as a Realtor at some
3　　point?
4　A. No.
5　Q. Now you are acquainted with the plaintiff
6　　in this case, George Stoddard?
7　A. Yes.
8　Q. When did you become acquainted with
9　　Mr. Stoddard?
10　A. I believe it was 2000, the year 2000 in
11　　November.
12　Q. How did you meet him?
13　A. I met him at work.
14　Q. What work was that?
15　A. We were both union carpenters working in
16　　a vent building for the Walsh Company.
17　Q. Where was that?
18　A. In Boston in the North End.
19　Q. And is Mr. Stoddard's current address
20　　the same as yours?
21　A. Yes.
22　Q. Would you describe yourself as having a
23　　dating relationship with him?
24　A. No.

Page 9

1  Q. Just a friend?
2  A. Yes.
3  Q. Now you're aware of an ongoing conflict
4     that Mr. Stoddard has been having with
5     his neighborhood, Louis Rubbo, regarding
6     the property line between the two houses?
7  A. Yes.
8  Q. When did you first become aware of a
9     dispute over that issue?
10 A. At the beginning of 2001. It might have
11    been 1999, when I met him. I really
12    don't remember.
13 Q. Just your best estimate is fine.
14 A. Okay.
15 Q. How did you become aware of that? Did
16    Mr. Stoddard tell you?
17 A. Yes. I went to his house on occasion,
18    and he told me the story.
19 Q. What did he tell you, as best you can
20    remember?
21 A. He told me that he met, or he was in a
22    coffee shop, and his neighbor came up to
23    him, or didn't come up to him, came to
24    the register and George said he said hi

Page 10

1     to him. Rubbo didn't answer him. And he
2     said -- George said to him, Do you have a
3     problem with me? And he says, Yeah. He
4     says, I own the house your own, something
5     like that, and I own your property. I'll
6     give you a little something for it, just
7     so you don't lose everything. That's how
8     it started.
9  Q. Did George tell you when that
10    conversation took place?
11 A. I believe it took place, I'm guessing,
12    1997 maybe, '98 possibly.
13 Q. Did George tell you how he responded to
14    that statement by Rubbo?
15 A. He said it just got him to thinking, and
16    he didn't understand what he meant.
17 Q. Now, is it correct that on a number of
18    occasions police have been called by
19    one person or another to intervene in
20    disputes between Mr. Stoddard and
21    Mr. Rubbo?
22 A. Yes.
23 Q. Have you been present for some of those
24    occasions in which the police have come?

Page 11

1  A. Yes.
2  Q. Do you remember the first time that you
3     were there and the police were called,
4     when that was?
5  A. I believe it was the spring or the summer
6     of 2000 or 2001. I actually don't
7     remember which year. I have a notebook
8     that would tell me.
9  Q. What happened on that occasion, as best
10    you can remember?
11 A. He said I was parking on his property.
12 Q. Rubbo told you that personally?
13 A. Well, both of us, we were both there,
14    George and myself.
15 Q. So, you were standing outside when he
16    confronted you?
17 A. Yes.
18 Q. How did you respond, or how did you
19    respond, if you did?
20 A. I don't believe I said much. I think
21    George pretty much handled it and said,
22    This is my property. She is not on your
23    property.
24 Q. Do you know who called the police that

Page 12

1     day?
2  A. It would have been Rubbo, I believe.
3  Q. How did that happen? Did he have a cell
4     phone, or did he go into his house and
5     call?
6  A. I don't remember.
7  Q. And what happened when the police
8     arrived?
9  A. To the best of my knowledge, they said
10    that they couldn't be involved in
11    anything like that. I know that George
12    tried to show him papers that he did, in
13    fact, own the property. Rubbo said that
14    he owned the property, and the police
15    just said, We can't get involved. We're
16    not -- this isn't what we do.
17 Q. Did they leave after some point after
18    saying that?
19 A. Yes, they left.
20 Q. And did your confrontation with Mr. Rubbo
21    end when the police left?
22 A. Yeah, he would come outside a lot and
23    spit at the truck and yell obscenities,
24    but I didn't talk to him.

STODDARD V. SOMERS     Condenselt™     DEBORAH ANN KELLY 7/6/04

Page 13

1 Q. I realize this is not something you'll
2    remember with precision right now. Could
3    you give me your best approximation of
4    how many times the police had been called
5    since that occasion that you're aware of?
6 A. I would say at least 30, 35 times.
7 Q. When was the most recent occasion?
8 A. I'd say about a week ago, maybe.
9 Q. What happened on that occasion?
10 A. I remember Rubbo called them, and I was
11    in the house. I didn't go out, but I
12    looked out the window. I had the
13    screen -- the window open. And Rubbo
14    started saying something to the police
15    about George compromising the wall, or
16    the patio that he was building, because
17    of the water drain off, something like
18    that. And the cops shook their head and
19    said, We don't care.
20 Q. Can you clarify when he said compromising
21    wall?
22 A. There's water that runs off the street,
23    and there is a thing that diverts the
24    water that George had installed, and it

Page 14

1    runs beside the house, which is right
2    next to where he put granite, Rubbo put
3    granite. And the more the water rushed
4    down there, the more it started to sink,
5    his granite did.
6       And one day the granite finally
7    fell over, and that's when he called the
8    police. And police says, We don't care
9    anymore. Have a nice day and they left.
10 Q. Was George also home at the time?
11 A. No, he was not.
12 Q. Did you speak with the police, when they
13    came?
14 A. No.
15 Q. So, you just overheard the police talking
16    to Mr. Rubbo outside?
17 A. Yes.
18 Q. Now, as you know, we're here because of
19    an incident that happened on April 21st,
20    2002 involving you, Mr. Stoddard, and Mr.
21    Rubbo. Let me first ask you, I believe
22    the day before that, on the 20th, your
23    car was parked in the driveway adjoining
24    the two houses.

Page 15

1 A. Correct.
2 Q. And it was parked on Mr. Rubbo's side
3    of the driveway, is that right?
4 A. It depends on how you look at it. It's
5    actually -- he thinks it's his driveway.
6    George thinks it's his driveway.
7 Q. And was your car parked on, at least
8    partially, the side of the driveway that
9    you and Mr. Stoddard admit is Mr.
10    Rubbo's?
11 A. It's not his property, no, but he does
12    use it as a driveway. We don't use it as
13    a driveway. He does.
14       MR. SHARP: Let's go off for a
15    second.
16       (Off the record.)
17       (Back on the record.)
18       MR. SHARP: So, we've just
19    had an off the record conversation, and
20    strictly for purposes of this deposition
21    to expedite the deposition, we're going
22    to call the driveway that is in front of
23    Rubbo's garage Rubbo's driveway. This is
24    without Deborah Kelly conceding that it

Page 16

1    is, in fact, Rubbo's property, but we're
2    going to call it Rubbo's driveway.
3    And then the dirt strip that runs
4    between "Rubbo's driveway" and George's
5    house, we're going to refer to as
6    George's driveway or Stoddard's driveway,
7    again without any concession by anyone
8    whose property that actually might be.
9       MR. CARLSON: That's fine.
10 Q. And given how Mr. Sharp just described
11    it, was your car parked on Stoddard's
12    driveway or Rubbo's?
13 A. Rubbo's.
14 Q. When did you move it there?
15 A. The day before, I believe. I can't
16    remember, but I think it was the day
17    before for the first time.
18 Q. Was there a reason that you parked it
19    on Rubbo's driveway as opposed to
20    Stoddard's?
21 A. Yes, because Rubbo parked in Stoddard's
22    driveway, and I had no place to park.
23 Q. Had that happened before?
24 A. Not in that exact manner. He blocked

Page 17

1    Stoddard's driveway, but didn't actually
2    pull right into it.  It affected me
3    anyway.
4  Q. He blocked it by parking in the street in
5    front of it?
6  A. Yes.
7  Q. How many times had that happened, if you
8    remember?
9  A. Dozens.
10 Q. Where did you park your truck, when he
11   would do that?
12 A. I would just pull it into the street
13   just enough; so other cars could get by.
14 Q. And so, when you said that you had no
15   place to park, what you meant is there
16   was no driveway place for you to park?
17 A. Yes, there is the parking ban in the
18   wintertime that you have to be off the
19   street.
20 Q. How many months does that apply for?
21 A. I'm not sure, but it goes until April,
22   I think.
23 Q. Until the end of April?
24 A. I think so, but I don't know.

Page 18

1  Q. Does that mean that you can't park it
2    overnight on the street?
3  A. Correct.
4  Q. And was Mr. Rubbo's car parked near yours
5    on April 21st?
6  A. It was in Stoddard's driveway.
7  Q. It was in Stoddard's driveway.  And am I
8    right that at some point the following
9    day on April 21st you learned that the
10   tires on your truck had been flattened?
11 A. Yes.
12 Q. And how did you learn that?
13 A. George told me.  He said, Kelly, they
14   just -- Rubbo just pulled all the valve
15   stems out of your tires.  He says, I
16   tried to pump them up with a compressor,
17   but they just went flat again.
18 Q. At what point in the day did he tell you
19   that?
20 A. I can't remember -- in the morning, I
21   believe.
22 Q. And your tires had not been flattened,
23   when you had gone to bed the night
24   before?

Page 19

1  A. I can't remember.
2  Q. Had you ever previously had problems
3    with having your tires flattened, when
4    you parked there?
5  A. No, I've never parked there before.
6  Q. So, that was the first time that you
7    parked in Rubbo's driveway?
8  A. Yes.
9  Q. What happened after George told you that
10   your tires had been flattened?
11 A. I asked him if he could fix them; so he
12   went and got some stuff to try and fix
13   them, some new valve stems, but they
14   still weren't holding air.  One of them
15   held a little air.
16 Q. Was this at some point in the morning
17   that day?
18 A. Yes.
19 Q. And this was a Sunday morning, is that
20   right?
21 A. Yes.
22 Q. Were you with George, when he tried to
23   fix your tires?
24 A. No.

Page 20

1  Q. How did you learn that he hadn't been
2    able to fix them?
3  A. He just told me.
4  Q. Did you go out and look at them yourself?
5  A. Yes.
6  Q. And what happened after you noticed, or
7    George told you that he hadn't been able
8    to fix your tires?
9  A. I just started doing some stuff out in
10   the back of the house, cleaning some
11   stuff up, and just trying to figure out
12   what to do.
13 Q. Now, at some point after that, police
14   officers arrived at the house, is that
15   right?
16 A. Yes.
17 Q. About how long after you had gone out to
18   do work out in the yard was that, do you
19   remember?
20 A. Within the half hour I'd say.
21 Q. So, do you think it was early afternoon
22   when the police came or late morning?
23 A. Probably around noon, I'm thinking,
24   sometime around there.

Page 21

1  Q. So, how did you notice the police
2     arrived?  Did you hear sirens?
3  A. I did.  I heard sirens and tires.
4  Q. And what happened after that?
5  A. George came out back and said, Kelly,
6     I think you ought to come out here.
7     He said, There's -- a tow truck was out
8     there already.  I had seen the tow
9     truck.  He said, The cops are here.
10 Q. You had seen the tow truck before the
11    police came?
12 A. Yes.
13 Q. Had you been curious why the tow truck
14    had arrived?
15 A. Well, I already knew that part, because
16    Rubbo called them to tow it, but George
17    was dealing with it.  I wasn't.
18 Q. Had George told you that Rubbo had called
19    a tow truck?
20 A. I just saw it coming, and I went out
21    front and saw it.
22 Q. So, you just assumed that Rubbo had been
23    the one to call the tow truck?
24 A. Well, I heard them talking; so I knew he

Page 22

1     did.
2  Q. You had heard Rubbo and Stoddard arguing?
3  A. Yes.
4  Q. Did you hear Rubbo say, I am going to
5     call a tow truck to George?
6  A. No.
7  Q. What happened after George came to you
8     and said, I think you should come out
9     front?
10 A. I went out front.  There was a bunch of
11    police there and a tow truck, and they
12    were talking back and forth.
13 Q. Rubbo and Stoddard were talking?
14 A. No, the tow truck driver and the police.
15 Q. Where was George standing exactly, when
16    you joined him?
17 A. Somewhere near where I usually park my
18    truck, where Rubbo's truck was, but I
19    think he was in the street.  I can't
20    remember, in that general vicinity.
21 Q. Now did you go and stand next to George?
22 A. Yes, I did.  I'm pretty sure I did.
23 Q. Did you speak with Rubbo after you came
24    out front?

Page 23

1  A. I think I did say something to him, like
2     I'd be happy to move the truck, if I had
3     air in my tires and you move your truck.
4  Q. Did he say anything in response to you?
5  A. He said -- do you want me to, like be
6     graphic exactly what he said.
7  Q. Absolutely.
8  A. He said, Get your fuckin' truck off my
9     fuckin' property now.
10 Q. And did you answer him, when he said
11    that?
12 A. That's when I said, I'd be happy to move
13    it, if there was air in my tires.  I
14    don't want to drive on the rims.  And he
15    just said, You're a fuckin' cunt and he
16    spit.
17 Q. Do you remember saying anything else to
18    him?
19 A. I can't remember.
20 Q. Do you remember him saying anything else
21    to you besides statements like that?
22 A. I can't remember.
23 Q. Now, at some point the police officers,
24    who had arrived, spoke to you, is that

Page 24

1     right?
2  A. Yes.
3  Q. About how long after you came out front
4     and joined George?
5  A. It all happened pretty quickly, within
6     minutes.
7  Q. Within minutes?
8  A. Uh-huh.
9  Q. A few minutes?
10 A. Yeah.
11 Q. What did the police say to you?
12 A. They told me to move my truck.
13 Q. Do you remember which officer it was who
14    said that to you?
15 A. No.
16 Q. Had you met any of the officers who
17    arrived?
18 A. On previous occasions possibly, but
19    I wasn't really thinking about that.
20 Q. Did you know any of their names?
21 A. Not at the time.
22 Q. Had you become acquainted with them, or
23    you just recognized them from previous
24    times they had come?

Page 25

1  A. I recognized them, but I didn't know
2     their names. If I did, I forgot.
3  Q. Do you remember how many police officers
4     arrived?
5  A. It seemed like a lot, but I'm guessing
6     five or six. I don't remember.
7  Q. Did you speak with the tow truck operator
8     at any point?
9  A. I can't remember that either. I don't
10    know if it was George or me, but one of
11    us said, You can't tow that. It's on
12    private property. And I think George
13    said, It's my property. I don't remember
14    if I said anything. I don't remember.
15 Q. What did you say in response, if
16    anything, when the police told you to
17    move your truck?
18 A. I told them I couldn't, because the tires
19    were flat.
20 Q. And how did they respond to that?
21 A. Something like move your fuckin' truck
22    within four minutes or you're going to be
23    arrested. You have four minutes to move
24    that truck.

Page 26

1  Q. So, one of the police cursed?
2  A. Yes.
3  Q. How did you respond, when they said, You
4     have four minutes to move the truck?
5  A. That's when George was leaning on the
6     Volvo that was in the driveway also, but
7     it was pulled back further. He says,
8     Kelly, if you're going to move your
9     truck, move it now. Rubbo just moved
10    his.
11 Q. Did you see Rubbo move his truck?
12 A. No, didn't even notice.
13 Q. And did Rubbo return at any point soon
14    after that?
15 A. Yeah, he was standing in the street at
16    one point.
17 Q. Did you notice where he parked his car
18    after he moved it?
19 A. I didn't notice.
20 Q. Did you hear George speaking with the
21    police at that time?
22 A. No, I didn't hear him talking with the
23    police at that time. He was pretty
24    quiet.

Page 27

1  Q. Was he standing next to you?
2  A. No, he was leaning on the Volvo, and I
3     came up to him, when he says, Kelly, and
4     I said, What? He said, If you are going
5     to move your truck, you better move it
6     now.
7  Q. When you say leaning on the Volvo, was
8     that George's car?
9  A. It's registered to me.
10 Q. Where was the Volvo parked?
11 A. In the same driveway, but just pulled in
12    back more, Stoddard's driveway.
13 Q. So, Rubbo had been blocking the Volvo
14    before?
15 A. Yes, he was. It was not registered at
16    the time.
17 Q. So, you owned the Volvo, but it wasn't
18    registered.
19 A. Yes.
20 Q. And at some point did a police officer
21    tell you that you had to move from where
22    you were standing, because you were
23    standing on Rubbo's property?
24 A. Yes, I think he did.

Page 28

1  Q. And, again, just to be clear, when I
2     say Rubbo's property, I'm not trying to
3     conceive who actually owns the land.
4     I'm just asking what they said.
5  A. I think I recall that, but I don't
6     remember how it was put to me.
7  Q. How did you respond?
8  A. That's when I walked over to George.
9  Q. And George was standing in Stoddard's
10    driveway, as we've been saying?
11 A. Yes, leaning on the Volvo, like sitting
12    on it kind of on the front.
13 Q. So, after Rubbo moved his car, George
14    told you, If you're going to move your
15    truck, do it now, and then you did, in
16    fact, get into your truck?
17 A. Yes.
18 Q. And what happened after you got into your
19    truck?
20 A. I started it up. I backed it out, and I
21    pulled it right in front of George's
22    house.
23 Q. So, you were planning to move it on the
24    street in front -- onto the street in

Page 29

1   front of George's house?
2   A. No, I was going to just pull it right in
3    front of George's house. There's too
4    much going on in the street and I have
5    flat tires.
6   Q. So, you were going to move it onto the
7    grass?
8   A. The dirt really, dirt and grass.
9   Q. What did the police say to you
10    immediately before you got into your
11    truck?
12   A. That I had four minutes to move it or I
13    would be arrested.
14   Q. And do you remember them saying anything
15    else?
16   A. No.
17   Q. How far did you move your truck, when you
18    backed it up?
19   A. I backed it up just enough; so I could
20    turn my wheels and come in front of
21    George's house.
22   Q. Can you give me your best estimate of
23    how many feet you moved it?
24   A. Uh-huh, about 40.

Page 30

1   Q. And so, you kind of moved it at an angle,
2    isn't that right?
3   A. No, straight in front of his house,
4    parallel with his house.
5   Q. And about how long did it take you to
6    move your truck backward?
7   A. Backward, five or 10 seconds. It was
8    pretty quick.
9   Q. And did you see any other police officers
10    outside your truck, when you were moving
11    it?
12   A. No.
13   Q. Did you see them before you started the
14    engine up?
15   A. No, I didn't pay attention to where they
16    were.
17   Q. What happened after you finished moving
18    your truck?
19   A. One or two of the cops started beating on
20    my window. One of them took the stick
21    out of his pocket and smashed the glass.
22   Q. And which window was an officer banging?
23   A. The driver's window.
24   Q. Is your truck a two seater?

Page 31

1   A. Yes.
2   Q. And so --
3   A. Or three, it's a bench.
4   Q. So, are there rear windows?
5   A. Yes.
6   Q. Were they banging on the rear windows?
7   A. Not that I know of.
8   Q. So, when you say "the driver's window",
9    it's the one immediately next to you?
10   A. Yes.
11   Q. What happened after they were banging on
12    the windows?
13   A. When the glass started to fly, I jumped
14    out of the passenger door, and ran into
15    the house, and closed the door.
16   Q. Did they say anything to you after
17    banging the window open or smashing the
18    window?
19   A. I didn't hear a thing. When my truck
20    starts, the radio just comes on, because
21    I don't shut it off. I wouldn't hurt
22    anything anyway. I don't think they said
23    anything to me. I knew that they were
24    breaking my window.

Page 32

1   Q. Did you hear an officer say, You're under
2    arrest before you ran into the house?
3   A. No.
4   Q. What happened after you ran into George's
5    house?
6   A. They kicked the door in.
7   Q. Did you close the door before any police
8    came in?
9   A. Yes.
10   Q. Did you lock the door?
11   A. It was too quick.
12   Q. Did you notice how they opened it, if
13    they pushed it open or kicked it? Did
14    you see?
15   A. They kicked it. I don't know how -- they
16    probably turned the knob. I don't know,
17    but they kicked it in. There's a big
18    dent in it.
19   Q. When you went into the house, George had
20    gone in before you?
21   A. Yes.
22   Q. Did you see when he went into the house?
23   A. Not really. I wasn't thinking about it.
24   Q. You saw him, when you went into the

**STODDARD V. SOMERS**  CondenseIt™  **DEBORAH ANN KELLY 7/6/04**

Page 33

1 house?
2 A. Yeah, I saw him when I got into the
3 house.
4 Q. How close to the door was he?
5 A. Maybe eight feet away.
6 Q. What was he doing?
7 A. Just standing there.
8 Q. Did you say anything to him, when you
9 ran into the house?
10 A. No, because when I got there, the door
11 just came down immediately -- in
12 immediately. I don't think I said
13 anything.
14 Q. How many seconds after you closed the
15 door did the police open it?
16 A. Two, three.
17 Q. And how far into the house were you, when
18 they opened it?
19 A. Three or four feet.
20 Q. And did George say anything to you, when
21 you came into the house?
22 A. No, not that I can remember.
23 Q. Then what happened after the police came
24 in?

Page 34

1 A. I just remember three guys on top of me
2 putting me to the ground, and banging my
3 head on the floor, because my glasses
4 smashed.
5 Q. Did the three police take you down at the
6 same time, or did one take you down, and
7 the other two then try to control you?
8 A. I don't know, but it all happened so
9 quick. I just remember I had a knee
10 on me, and a foot on me, and somebody
11 grabbing my hands.
12 Q. What was your intention in running into
13 the house? What were you hoping to do?
14 A. I was just afraid. I didn't know why
15 they were breaking my window.
16 Q. Would you say you were kind of panicking?
17 A. Totally. I was scared to death.
18 Q. Did the police say anything to you after
19 they tackled you?
20 A. Yeah. They said I was under arrest.
21 Q. Did you notice which officer said that
22 to you?
23 A. No.
24 Q. What happened after that?

Page 35

1 A. They told me something about getting my
2 hands out. They needed my hands to put
3 the cuffs on, something like that, and
4 make sure it was pulled up over my
5 breast. I was on top of my hands, when I
6 got put down. One of them had their knee
7 in my back. I couldn't get my hands
8 out. I remember yelling to George,
9 saying, George, pull my shirt down, pull
10 my shirt down.
11 Q. So, you were lying on your chest on the
12 floor.
13 A. Yes.
14 Q. What did George say to you, if anything,
15 after you said help me with that?
16 A. I didn't hear him say anything. I was
17 wondering why he didn't.
18 Q. What happened after the police told you
19 that they needed to handcuff you?
20 A. I kept saying, Pull my shirt down, pull
21 my shirt down. That's all I can
22 remember.
23 Q. And did you see Officer Rick Somers come
24 into the house?

Page 36

1 A. No, I didn't notice.
2 Q. Did you see him inside the house?
3 A. No.
4 Q. Did you hear him say anything to
5 Stoddard?
6 A. No.
7 Q. Did you hear George say anything to him?
8 A. No.
9 Q. So, at some point the officers handcuffed
10 you.
11 A. Yes.
12 Q. How did that happen? Were you finally
13 able to get your hands free and put them
14 behind your back?
15 A. Yes. I don't know how.
16 Q. And they helped you stand up at that
17 point?
18 A. Yes.
19 Q. What happened after that?
20 A. I remember one of the cops going
21 Woo, because my shirt was up. I can't
22 remember how it got down again, but
23 somebody pulled it down.
24 Q. You don't remember who that was?

Page 37

1  A. No.
2  Q. Did they take you out of the house after
3     that?
4  A. Yes.
5  Q. And did you say anything to George
6     between the time that you got up and
7     the time that you were taken out of
8     the house?
9  A. I don't think so.  George just said,
10    Go easy, Kelly.  It will be all right,
11    something like that.
12 Q. Did you say anything to him?
13 A. I don't think so.  I think I was just
14    crying.
15 Q. And did the police put you into one of
16    the cruisers?
17 A. Yes.
18 Q. Into the back seat of it?
19 A. Yes.
20 Q. How long were you sitting in the back
21    seat of the cruiser before they drove off
22    to take you to the station?
23 A. Well, they had to keep adjusting my
24    handcuffs, because it was cutting off the

Page 38

1     circulation pretty much after that.  They
2     told me it was all right, but I said, No,
3     my fingers are getting numb.  They said,
4     It's loose enough and shut the door.  I
5     think we drove off.
6  Q. So, the police were standing outside, and
7     you were sitting in the back seat, when
8     you were trying to have your handcuffs
9     adjusted?
10 A. I can't remember.
11 Q. Did any of the police sit in the back
12    with you?
13 A. I don't think so, but I can't remember.
14 Q. About how long was it between the time
15    they first put you into the car and
16    when they drove off with you?
17 A. I don't remember.
18 Q. Thirty seconds, a minute, two minutes?
19 A. I'd say within a minute, but I don't
20    remember.  I was like pretty hysterical.
21    I was really upset.
22 Q. Did you see where George was while you
23    were sitting in the back of the car?
24 A. No.

Page 39

1  Q. Did you notice anyone else who was around
2     speaking with him?
3  A. No.
4  Q. While you were being driven to the
5     station, did you have any further
6     conversation with any of the police?
7  A. I can't remember.
8  Q. Did they tell you that they thought that
9     you had hit one of the officers, when you
10    were moving your truck?
11 A. I can't remember.
12 Q. But at some point you became aware that
13    they believed that you had hit one of the
14    officers?
15 A. Yes.
16 Q. When was that that you were told that?
17 A. I think when they told me the charges, I
18    guess that I was -- it was like five
19    things that they arrested me for.
20 Q. So, was that in an arraignment before a
21    judge?
22 A. I think so.
23 Q. When was that?  Was that the same day?
24 A. It was probably the next day.

Page 40

1  Q. Had Stoddard bailed you out before you
2     had your arraignment?
3  A. Yes.
4  Q. How long after you were taken to the
5     station did he bail you out?
6  A. He brought the money to the police
7     station right away almost, I guess.  I
8     was in there probably for an hour or
9     two.  I can't remember how long.
10 Q. So, you weren't told what the charges
11    against you were before you were bailed
12    out?
13 A. I think I was told.  I just don't
14    remember who told me.
15 Q. What did they tell you, as best you can
16    remember, what the charges were?
17 A. Well, I know what the charges were, but
18    I don't remember what they told me.  It
19    was probably the same thing.  I just
20    don't remember.
21 Q. Do you remember being told that one of
22    the charges was assault and battery?
23 A. Yes.
24 Q. And did they tell you what the reason was

**STODDARD V. SOMERS**    CondenseIt™    **DEBORAH ANN KELLY 7/6/04**

Page 41

1    that they were going to charge you with
2    assault and battery?
3  A. That I tried to run over a police
4    officer.
5  Q. So, they told you that after you were
6    taken to the station.
7  A. I think so.
8  Q. How did you respond, if at all, when you
9    were told what the charges against you
10   were?
11  A. I didn't know what they meant.
12  Q. Do you remember having any further
13    conversations with any of the police
14    officers in the station?
15  A. I really don't. It's a blur.
16  Q. And is it fair to say that you were
17    waiting for George to come; so you could
18    figure out what was going on?
19  A. No, I wasn't really thinking of that.
20  Q. What happened after George came and
21    bailed you out?
22  A. We went to Honey Dew Donuts. His friend
23    Ray was there, and they were having a
24    coffee, and I just sat with them.

Page 42

1  Q. What was George's appearance like,
2    when he came and bailed you out?
3  A. He had a cut on his chin.
4  Q. And what part of the chin was it, if
5    you could just describe verbally, as
6    closely as you can, since we can't have
7    a pointing described on the transcript?
8  A. Under his lip down by the point on his
9    chin, kind of in the middle, I guess. I
10   don't know. I remember seeing it, but I
11   don't remember like exactly where it was
12   between his lip and his chin. It was
13   probably three quarters of an inch long,
14   if that tells you anything.
15  Q. Was it bleeding?
16  A. Yeah.
17  Q. How much was it bleeding?
18  A. I don't really know. He just like wiped
19   it every once in a while.
20  Q. And when you were sitting in Honey Dew
21   Donuts, did you discuss with George what
22   had just happened?
23  A. I asked him what happened to his chin.
24  Q. And what did he say?

Page 43

1  A. He said that Somers threw him to the
2    ground or something like that. I said,
3    Why?
4  Q. And did you know Somers?
5  A. No.
6  Q. Had George ever mentioned being
7    acquainted with him?
8  A. Yes.
9  Q. So, you knew of him by name.
10  A. Yeah, I did. George always had favorable
11   things to say about him.
12  Q. Is he someone you would have recognized?
13  A. No, not really.
14  Q. He's a neighbor of yours in the same
15   street, is that right?
16  A. Yes.
17  Q. What else did George say to you, when
18   you were talking about the incident?
19  A. About him or me?
20  Q. Whatever you remember.
21  A. I don't remember. I was just so stunned
22   about everything that happened. I just
23   don't remember.
24  Q. Do you remember saying anything to him?

Page 44

1  A. To George?
2  Q. Yes.
3  A. Well, I asked him about the cut. I
4    pretty much didn't want to talk. You
5    know, I was so upset. I said, Let's get
6    out of here. He wanted to be there and
7    have his coffee and relax, but I was so
8    embarrassed and everything about what
9    happened.
10  Q. Did you go back home at some point later
11   that day?
12  A. Yeah, right away, uh-huh.
13  Q. Did you look back at your truck, when you
14   arrived back home?
15  A. Yes.
16  Q. Did you notice anything about it that was
17   different?
18  A. Well, there was glass everywhere.
19  Q. Did you notice anything about the side
20   view mirrors?
21  A. I think one on the driver's door was
22   pushed in.
23  Q. You say "pushed in"?
24  A. It's one of those ones if you touch it,

Page 45

1    it goes in, and you pull it out, like
2    when you go through a car wash, stuff
3    like that. It's just one of those ones
4    that is meant to move.
5  Q. So, had it been moved closer or farther
6    away from the door?
7  A. I think it was next to the door from
8    what I can remember, but it didn't seem
9    important to me; so I didn't pay much
10   attention.
11 Q. Now, eventually you went on trial for the
12   charges that had been brought against
13   you?
14 A. Yes.
15 Q. When was that?
16 A. I probably, at least, ten times went to
17   court. I probably went to trial, I can't
18   even remember, January.
19 Q. What were the results of your trial?
20 A. I was found guilty of criminal trespass
21   and resisting arrest.
22 Q. And you were acquitted on the other
23   charges.
24 A. Yes.

Page 46

1  Q. Which three charges were those?
2  A. Assault and battery with a dangerous
3    weapon, assault and battery with a
4    dangerous weapon against a police
5    officer, I think, and I forget the
6    third one.
7  Q. Did you file an appeal from the two
8    charges that you were convicted on?
9  A. Yes.
10 Q. And has that appeal been decided?
11 A. No.
12 Q. What is the current status of the appeal?
13 A. The lawyer, she has everything, and she
14   is pretty much handling it.
15 Q. Do you know if there has been any oral
16   argument on your appeal?
17 A. I don't think so as of yet.
18 Q. Do you know if a brief has been filed for
19   you?
20 A. What does that mean?
21 Q. A written submission that a lawyer writes
22   in support of your appeal.
23 A. Yes, that has been done.
24 Q. Do you know when that was filed?

Page 47

1  A. A few months ago anyway.
2  Q. Have you been arrested in connection with
3    any dispute involving Rubbo and Stoddard
4    since April 21st?
5  A. No.
6  Q. Has Mr. Rubbo been arrested in any of
7    these incidents since then?
8  A. Not that I know of.
9       (Off the record.)
10      (Back on the record.)
11      MR. CARLSON: I don't think I
12   have anything more. Now, if Mr. Sharp
13   has questions for you, it's possible I'll
14   have something else.
15      MR. SHARP: No, I don't.
16      MR. CARLSON: I guess we're
17   done.
18      (Whereupon deposition concluded
19   at 11:02 a.m.)
20
21
22
23
24

Page 48

1       ERRATA SHEET
2  CHANGES TO THE DEPOSITION OF:
3
4  INSTRUCTIONS TO WITNESS: 1) Please note
5  any desired corrections to your testimony
6  by page and line number. 2  ) Enter text
7  as it appears in the transcript. 3)
8  Enter text as it should appear.
9
10 PAGE    LINE      SUGGESTED CORRECTION
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 49

```
 1        SIGNATURE PAGE
 2
 3
 4
 5
 6        I,              , do
 7   hereby certify that I have read the
 8   foregoing transcript of my testimony, and
 9   further certify that said transcript is a
10   true and accurate record of said
11   testimony.
12
13
14
15        Dated at      , this
16   day of        , 2003
17
18
19
20
21
22
23
24
```

Page 50

```
 1        COMMONWEALTH OF MASSACHUSETTS
 2
 3   Norfolk, ss.
 4
 5        I, JUDITH R. SIDEL, a Registered
 6   Professional Reporter and Notary Public,
 7   in and for the Commonwealth of Massachusetts,
 8   do hereby certify that:
 9        DEBORAH ANN KELLY, the witness
10   whose deposition is hereinbefore set
11   forth, was duly sworn by me and that such
12   deposition is a true and accurate record
13   to the best of my knowledge, skills and
14   ability, of the testimony given by such
15   witness.
16        IN WITNESS WHEREOF, I have
17   hereunto set my hand and affixed my
18   Notarial Seal this 12th day of August
19   2004.
20
21            JUDITH R. SIDEL
22            NOTARY PUBLIC
23   Commission expires:
24   June 5, 2009.
```

# EXHIBIT C

**Page 1**

```
1                                          Volume: 1
2                                          Pages:  1 to 62
3                                          Exhibits: See Index
4              UNITED STATES DISTRICT COURT
5            FOR THE DISTRICT OF MASSACHUSETTS
                    C.A. No. 03 10461 DPW
6
7    GEORGE STODDARD,                    )
                     Plaintiff          )
8                                        )
9        vs.                             )
                                         )
10   RICHARD SOMERS, in his personal    )
     and official capacity, and        )
11   THE TOWN OF ROCKLAND,              )
     MASSACHUSETTS,                      )
12                   Defendant          )
13
14   DEPOSITION of RICHARD SOMERS,
     a witness called on behalf of the
15   Plaintiff, pursuant to the applicable
     provisions of the Federal Rules of
16   Civil Procedure, before Judith R. Sidel,
     Professional Court Reporter and Notary
17   Public, in and for the Commonwealth of
     Massachusetts, at the office of Pierce,
18   Davis, Perritano, LLP, 10 Winthrop
     Square, Boston, Massachusetts 02110-1257,
19   on Tuesday, July 6, 2004, commencing at
     2:00 p.m.
20
21   APPEARANCES: (Continued on page 2)
22                   * * * *
              SIDEL COURT REPORTING
23           Certified Shorthand Reporters
                   35 Tudor Road
24             Needham, Massachusetts 02492
```

**Page 2**

```
1    APPEARANCES (Continued):
2
3    DANIEL S. SHARP, ESQUIRE
     WHITFIELD SHARP & SHARP
4    196 Atlantic Avenue
     Marblehead, Massachusetts 01945
5        On behalf of the Plaintiff
6    BRIAN D. CARLSON, ESQUIRE
     PIERCE, DAVIS, PERRITANO, LLP
7    10 Winthrop Square
     Boston, Massachusetts 02110-1257
8        On behalf of the Defendant
```

**Page 3**

```
1                    I N D E X
2
3    WITNESS        DIRECT CROSS REDIRECT RECROSS
4
5    Richard Somers
     (By Mr. Sharp)     4
6
7              E X H I B I T S
8    NO.     DESCRIPTION         PAGE
9    1       Police Logs         10
10   2       Photograph          53
11   3       Photograph          54
12   4       Photograph          54
13   5       Photograph          56
14   6       Photograph          57
15   7       Photograph          57
```

**Page 4**

## STIPULATIONS

It is hereby stipulated and agreed by and between counsel for the respective parties that the deposition will be read and signed under the pains and penalties of perjury. It is also stipulated that the notarization will be waived.

Failure to sign transcript within thirty (30) days will deem the signature waived.

It is further stipulated and agreed that all objections, except as to form, and motions to strike are reserved until the time of trial.

\* \* \*

RICHARD SOMERS, a witness called by counsel for the Plaintiff, upon production of police badge, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SHARP:

Q. It's Sergeant Somers?

**STODDARD V. SOMERS** CondenseIt™ **RICHARD SOMERS 7/6/04**

Page 5

1 A. No, officer.
2 Q. Officer Somers, then, have you had your
3   deposition taken at any time before?
4 A. Yes, I have.
5 Q. Do you know how many times?
6 A. Once.
7 Q. And what kind of case was that?
8 A. It was Sergeant Shallies of the Rockland
9   Police. I was called as a witness.
10 Q. So, you have never been a defendant in a
11   civil action.
12 A. No.
13 Q. Have you ever been a defendant in a
14   criminal action?
15 A. No.
16 Q. I don't ever want you to tell me anything
17   that you've discussed with Mr. Carlson,
18   but did you have a chance to just
19   generally familiarize yourself with
20   what's going to go on at the deposition
21   today?
22 A. Yes, he told me that you would ask me
23   questions, and that he would have an
24   opportunity to ask questions.

Page 6

1 Q. And one of the things we have to avoid is
2   talking at the same time. A lot of the
3   time you will know the question that I'm
4   going to ask you before I finish it,
5   but be patient; otherwise, it makes it
6   difficult for the court reporter. If you
7   want to take a break at any time, just
8   say so, no problem. I don't think we're
9   going to be all that long. If you want
10   to take a break, just let me know.
11     Some of the time you probably
12   won't understand my question, either
13   because I've been vague or, you know,
14   just screwed up the question. If so,
15   just let me know, and I will rephrase
16   it and try to make it clear.
17 A. Thank you.
18 Q. When were you first hired by the Rockland
19   Police Department?
20 A. Full-time I was hired in 1984. Before
21   that I was an intermittent police officer
22   for nine and a half years.
23 Q. What does it mean to be an intermittent?
24 A. Your permanent intermittent means your

Page 7

1   permanent part-time civil service
2   appointed.
3 Q. And since 1984 what has been your
4   position with the Rockland Police
5   Department?
6 A. Patrolman.
7 Q. Aren't you the police prosecutor now for
8   Rockland?
9 A. Currently I'm assigned to the Hingham
10   District Court, police prosecutor.
11 Q. When did that start?
12 A. Last year, about a year ago.
13 Q. And you know we're here about the April
14   21 -- what was it 2000, 2001 entry of
15   George Stoddard's house, right?
16     MR. CARLSON: 2002.
17 Q. Sunday, April 21, 2002.
18 A. That's correct.
19 Q. What's the first time you can recall
20   being aware that there was any kind
21   of dispute going on between Rubbo
22   and Stoddard over their property?
23 A. For a while.
24 Q. I mean, do you think it was like four

Page 8

1   years before 2002 or four months? Do you
2   have anyway to quantify it?
3 A. No, I don't.
4 Q. But you knew for at least, what, at least
5   a few months before?
6 A. Oh, absolutely.
7 Q. And how did you first become aware that
8   there was a dispute between Rubbo and
9   Stoddard?
10 A. The police department had numerous calls
11   there about the dispute.
12 Q. Do you think that's how you first became
13   aware?
14 A. I don't know whether Rubbo told me,
15   or Stoddard told me, or whatever.
16 Q. Now, how far away from Rubbo's house do
17   you live?
18 A. As the crow flies, probably 75 yards.
19 Q. What's your address then?
20 A. 28.
21 Q. Rubbo is, I think, 43 and Stoddard is
22   51.
23 A. Yeah.
24 Q. So, you live on the opposite side of the

Page 9

1  street?
2  A. That's correct.
3  Q. And before April 21st, 2002, did you
4     ever have a conversation with Rubbo about
5     this property dispute between him and
6     Stoddard?
7  A. He mentioned it, yes.
8  Q. What do you recall him mentioning?
9  A. I don't really get involved, because
10    they're neighbors; so I try not to
11    get involved. I told them, if there's
12    a dispute, get the land surveyed. I
13    told them both that. That's the simplest
14    explanation to that whole problem.
15    Somebody get it surveyed.
16 Q. But do you remember what Rubbo said to
17    you about it?
18 A. No. I just knew there was a problem. I
19    couldn't go back that far and tell you.
20 Q. And your advice to both of them, you say,
21    was to get the land surveyed.
22 A. Correct.
23 Q. Now, you became aware of numerous
24    reports, numerous calls from both of them

Page 10

1  to the Rockland Police Department, right?
2  A. That's correct.
3  Q. And I'd like to show you a batch of
4     documents called Rockland Police
5     Department dispatch logs.
6         MR. SHARP: I think we'll make
7     them all as Exhibit No. 1.
8         (Plaintiff's Exhibit No. 1,
       Police Logs, marked for identification.)
9
10 Q. You're certainly welcome to peruse them,
11    if you want to. I don't really want to
12    ask you questions about specific ones.
13    I wonder if you can just tell me if you
14    recognize what those documents that
15    comprise Exhibit 1, what are they?
16 A. It would be a police log from various
17    dates.
18 Q. And is that police log something that's
19    kept in the ordinary course of the
20    Rockland Police Department business?
21 A. Absolutely.
22 Q. And could you tell us just generally how
23    are those police logs made up? Somebody
24    makes a phone call and then what happens?

Page 11

1  A. The desk officer would type the incident,
2     the time of the incident, what unit
3     responded. This one here is June 13,
4     2001. Officer responded would be Mike
5     Brady. He was in unit M2, which is a
6     motorcycle. The time he was dispatched
7     was 5:04 p.m. He must have been even
8     in the area. He got there at 5:04 p.m.
9     He cleared at 6:31 p.m., then would give
10    a brief description of the incident.
11 Q. So, there is an operator who would --
12 A. A police dispatcher.
13 Q. A police dispatcher would get the call.
14    Would the police dispatcher be making up
15    the beginning of that radio log as the
16    person is making the phone call?
17 A. No.
18 Q. When would the dispatcher actually make
19    out the report?
20 A. Probably after he hangs up the phone,
21    because you have to type it into the
22    computer.
23 Q. So, quickly after receiving the
24    information, the dispatcher would enter

Page 12

1  the information.
2  A. Usually, unless it was real busy, then he
3     would write -- say if the call came in
4     and it was real busy, he would write it
5     down on a piece of paper.
6  Q. Might handwrite and later transpose it?
7  A. Correct.
8  Q. So, anyway, the initial information
9     about the call coming in and an officer
10    responding would take place within
11    minutes --
12 A. That's correct.
13 Q. -- of the call, is that correct?
14 A. Yes, that's correct.
15 Q. And then later on apparently, correct me
16    if I'm wrong, there's a report that comes
17    to the dispatcher from the officer about
18    what happened?
19 A. Correct.
20 Q. And is it the same thing? The dispatcher
21    would either type that out after talking
22    to the officer or write it down, then
23    transpose?
24 A. That's correct.

Page 13

1  Q. So, all of this information that's on
2     the police log is generated a couple
3     of minutes after the dispatcher gets
4     that information, is that right?
5  A. It should be. That's correct.
6  Q. And that would be the ordinary course
7     of business?
8  A. That's correct.
9  Q. And then these police logs, how are they
10    retained? Are they in a computer system?
11 A. It's in the computer. Also it's printed
12    out in a book.
13 Q. And if you could just briefly go through
14    those again, not reading the whole thing,
15    but is there any reason to believe that
16    any of those dispatches were made --
17    those logs were made in a manner, other
18    than what you've just described?
19 A. So far, no. That's the way it would
20    work. That one took a while; so they
21    might have been busy on the arrival.
22 Q. Which one are you talking about? Why
23    don't we just --
24 A. October 20th.

Page 14

1  Q. October 20th?
2  A. Of 2001.
3  Q. Why might that be unusual?
4  A. If they were busy at the time, the
5     dispatcher might not have put it in
6     on time.
7  Q. Might not have typed it, but would
8     have written it out, right?
9  A. Right, and then it appears that he
10    just -- he did after. If they were busy,
11    he put the arrival time almost one hour
12    later. I don't know what happened that
13    day. Basically that's the way they're
14    all working. You want that in there with
15    that?
16 Q. Sure.
17 A. Okay. This would not be part of the
18    log. This came out of the trespass
19    order.
20 Q. It's labeled Notice To Trespass at the
21    top.
22 A. Yeah. So far they're all filled out
23    correctly.
24 Q. And so, is it fair to say that with the

Page 15

1     exception of the notice to trespass page
2     and that one where there was an hour
3     lapse between the time of the call and
4     the time of the entry, that those police
5     dispatch logs were all made out in
6     accordance with what you described
7     earlier?
8  A. That's correct.
9  Q. And do the dispatchers have a duty to
10    be accurate, when they make those out?
11 A. Yes.
12 Q. And those are kept in the ordinary course
13    of business of the Rockland Police
14    Department?
15 A. Yes.
16 Q. And have you had on occasion to make
17    any of those police dispatch logs out
18    yourself at any time?
19 A. I've dispatched, yes.
20 Q. Is that pretty much the way you did them?
21 A. Yes, that's correct.
22 Q. When was that? Was that before you were
23    a full-time officer?
24 A. And during.

Page 16

1  Q. Now, you would agree with me that there
2     have been a lot of calls from Rubbo and
3     Stoddard.
4  A. That's correct.
5  Q. By the time April 21st, 2002 came along,
6     was there a sort of attitude among the
7     officers in terms of responding to
8     Stoddard and Rubbo calls?
9        MR. CARLSON: Objection. You
10       can answer.
11 A. No, we just have to go.
12 Q. But wasn't there a sort of rolling of the
13    eyes and, Oh, no, here we go again, when
14    you had to go to respond to these guys?
15       MR. CARLSON: Objection. You
16       can always answer, unless I tell you not
17       to answer.
18 A. No.
19 Q. Was Rubbo and Stoddard situation a little
20    bit unusual, or do you have a lot of
21    feuding neighbors in Rockland?
22 A. As of lately they're probably the most
23    frequent.
24 Q. When is the first time, just focusing on

Page 17

1     April 21st now, when is the first time
2     that you became aware that there was a
3     dispute of some sort going on that day?
4 A. I believe my wife said, The cruisers are
5     down the street.
6 Q. And was it after your wife told you that
7     the cruisers were down the street that
8     you went over there?
9 A. I didn't go over until she said that
10     Officer Donnelly had been struck by a
11     pickup truck.
12 Q. Why don't we go kind of step-by-step. Do
13     you recall approximately what time of day
14     it was that you first became aware that
15     there were cruisers down there?
16 A. No. I was outside.
17 Q. If Myers says that he arrived at 1:56
18     p.m., does that do anything to refresh
19     your recollection?
20 A. I know it was during the day shift around
21     lunchtime. I'm not sure.
22 Q. So, two o'clock, give or take a little?
23 A. Okay.
24 Q. So, your wife told you there are cruisers

Page 18

1     down there. What did she say, the
2     cruisers are down at Rubbo's?
3 A. She just said the cruisers are down the
4     street.
5 Q. So, then what did you do?
6 A. I kept working in the yard.
7 Q. What is it that you were doing?
8 A. I think I was working around the back
9     of the house by where I keep the grill.
10 Q. So, then what happened next?
11 A. She yelled at me that Paul needs help.
12     He was just hit -- struck by a truck,
13     pickup truck. She said, Paul needs
14     help. She screamed it out.
15 Q. That's referring to Donnelly?
16 A. Paul Donnelly, yes.
17 Q. So, then what happened?
18 A. I ran down the street.
19 Q. Actually ran?
20 A. Ran to Stoddard's house.
21 Q. And what did you first see, when you got
22     to Stoddard's house?
23 A. Officer Donnelly was standing next to the
24     pickup truck.

Page 19

1 Q. The black pickup?
2 A. The black pickup truck, that's correct.
3     He was facing down the street away from
4     my house. He was telling the driver,
5     Deborah Kelly, to get out of the truck.
6     That she was under arrest.
7 Q. And then what happened?
8 A. She didn't respond. He told her to get
9     out, or he would break the window. He
10     broke the window. As a matter of fact, I
11     told him to break the window. She would
12     not get out of the car, and she just
13     struck him with the truck. I said, Break
14     the window. He broke the window. She
15     exited the vehicle on the passenger
16     side. He reached in to unlock it, put
17     his hand right like this. The lock is
18     right there. He put his hand in to
19     unlock it, and she scooted out the
20     passenger side.
21 Q. Now, why did you tell Donnelly to break
22     the window?
23 A. He said he was struck by the car. She is
24     under arrest. That's assault and battery

Page 20

1     with a dangerous weapon. He was yelling
2     to her she was under arrest.
3 Q. Were you a superior officer of Donnelly's
4     at that time?
5 A. Yes, I would be.
6 Q. So, when you told him to break the
7     window, were you acting as a superior
8     officer in telling him what to do?
9 A. I would have, yeah. That's correct, but
10     he was also already going to break it.
11     I told him to break it. She just struck
12     him with the truck.
13 Q. Then she scooted out the truck up the
14     stairs through the door, is that right?
15 A. Correct.
16 Q. So, let's put Deborah Kelly just -- did
17     she have to open the door, do you recall?
18 A. I don't, sir.
19 Q. Let's put Kelly at the threshold of the
20     door. Where are you at that moment?
21 A. Behind Officer Donnelly.
22 Q. And still right around the pickup truck?
23 A. If she's in the house, we were entering
24     the house.

STODDARD V. SOMERS          CondenseIt™          RICHARD SOMERS 7/6/04

Page 21

1  Q. So, you're hot on her heels then.
2  A. Correct.
3  Q. And who's the first officer into the
4     house?
5  A. Donnelly.
6  Q. Are you the second officer into the
7     house?
8  A. Correct.
9  Q. And who's third and who's fourth, if you
10    recall?
11 A. I'm not sure where Byers came in. I
12    think, I'm not 100 percent, Sergeant
13    Jackson was right behind me.
14 Q. So, you think Jackson was third in?
15 A. I'm not exactly sure. Everybody was
16    tight together. I'm not sure.
17 Q. Is it fair to say that you, Donnelly,
18    Byers and Jackson all entered the door
19    within a few seconds of each other?
20 A. That's correct.
21 Q. And did you yourself kick the door, or
22    did you observe anyone kicking the door?
23 A. No.
24 Q. So, as far as you can recall, was the

Page 22

1     door open, when you and Donnelly first
2     got there?
3  A. As far as when I'm going into the home,
4     the both of us?
5  Q. Were going into the house.
6  A. I don't know whether it was partially
7     ajar or all the way closed.
8  Q. And do you recall whether it opens into
9     the house or out of the house?
10 A. In.
11 Q. So, when you first passed the threshold
12    of the door, what do you see?
13 A. Officer Donnelly grabbed Deborah Kelly.
14    Stoddard took a step or two towards
15    Officer Donnelly.
16 Q. And where is Stoddard?
17 A. To my left.
18 Q. To your left as you're entering?
19 A. Like I'm facing now, it would be to my
20    left.
21 Q. How far would you say Stoddard was from
22    the door?
23 A. I'm trying to remember the layout of the
24    house. It's very small, not far, very

Page 23

1     close, six, seven feet, between six and
2     eight feet.
3  Q. Six and eight feet from the door?
4  A. From myself, then he step towards
5     Donnelly, closer to Donnelly.
6  Q. And Donnelly is on your left?
7  A. He's on my right.
8  Q. He's on your right grabbing Kelly.
9  A. Just a little to my right.
10 Q. And --
11 A. One o'clock, two o'clock, at that angle.
12 Q. And before you saw Stoddard, what is it
13    that you were doing?
14 A. Following Donnelly in the house.
15 Q. And then you see Stoddard?
16 A. Correct.
17 Q. And then what happens next?
18 A. He stepped toward Officer Donnelly.
19    For officer safety I pushed him away.
20 Q. Now, is there any way to characterize
21    the way that Stoddard stepped toward
22    Donnelly? I mean, did he seem to be in
23    a fighting stance, or just taking a step
24    forward? Is it possible to describe

Page 24

1     that?
2  A. No. He just took a couple of steps
3     towards Donnelly. I felt he was a threat
4     towards Officer Donnelly at that time.
5  Q. But he didn't, like, have fists or
6     anything in his hands, did he?
7  A. I don't recall.
8  Q. Do you recall whether he had anything
9     in his hands?
10 A. He did not.
11 Q. So, you stepped towards Stoddard.
12 A. Correct.
13 Q. What did you do?
14 A. I pushed him away.
15 Q. Did your hands make contact with his
16    body?
17 A. Yes, they did.
18 Q. And then what happened?
19 A. He went into a chair. I just swore at
20    him. I yelled at him. He stayed there
21    in the chair, and I just stood like
22    probably this far away, three to four
23    feet away from him.
24 Q. When you say he went into the chair?

STODDARD V. SOMERS                   CondenseIt™                   RICHARD SOMERS 7/6/04

Page 25

1 A. A chair, or hassock, or something, I
2   can't recall exactly what it was, but
3   he was sitting down.
4 Q. When you say he went into the chair, do
5   you mean he went flying into the chair or
6   he just sat down?
7 A. I just pushed him, and he ended up in the
8   chair.
9 Q. And so --
10 A. Whether he tripped over something or
11   not, I don't know. There was clutter
12   everywhere. I mean, there was clutter
13   everywhere in the whole house.
14 Q. But at least some of his momentum toward
15   the chair was supplied by you then,
16   right?
17 A. I pushed him with enough force to stop
18   his forward motion to go after Officer
19   Donnelly, to stop his forward progress.
20 Q. Was that also enough force to throw
21   him -- to propel him, for lack of a
22   better word, into the chair?
23        MR. CARLSON: Objection.
24 A. I don't know. He's a lot smaller than

Page 26

1   I am, probably 100 pounds lighter; so I
2   just pushed to get him away from Officer
3   Donnelly.
4 Q. Now, I'll just note that when you
5   say "pushed", you're putting up both
6   of your hands?
7 A. Two hands to the upper chest area.
8 Q. Did you have anything in your hand
9   at the time?
10 A. No, I did not.
11 Q. So, he's sitting in the chair or the
12   hassock, whatever it is, and you're
13   standing three or four feet away. Then
14   what happened?
15 A. I heard all the yelling and screaming
16   behind me, and I heard Sergeant Jackson
17   say, Don't bite me. At that time I
18   turned and looked. Stoddard started
19   getting up. I said, Just stay there.
20   He sat back down. The two of us stayed
21   right where we were until she was in
22   custody.
23 Q. Now, did you see Deborah Kelly come
24   up off the floor, or were you paying

Page 27

1   attention to Stoddard?
2 A. I looked that one time, when I heard
3   Sergeant Jackson say, Don't bite me.
4   When he stood up, I refocused everything
5   onto Stoddard, because I didn't know if
6   he would get up again.
7 Q. But you said when you told him to stay
8   down there, he did.
9 A. Right, and then two of us just -- I faced
10   him. He faced me.
11 Q. What else did you hear of conversation or
12   yelling back and forth between Kelly and
13   the officers?
14 A. She was just screaming so loud. I could
15   hear Sergeant Jackson. I could hear them
16   saying, Give me your arm or something to
17   that effect. I don't recall too much
18   more, just a lot of people yelling.
19 Q. Do you recall her saying anything about
20   her shirt?
21 A. No, I don't.
22 Q. Do you recall hearing sort of a whooping
23   sound?
24 A. When it was all over, Officer Donnelly

Page 28

1   did say that, but it was probably pooped.
2 Q. So, what happened after Kelly is off the
3   floor in custody?
4 A. They took her out of the house, and Mr.
5   Stoddard and myself just walked out of
6   the house. We stood there and talked for
7   a few minutes. He talked to the sergeant
8   for a few minutes and I went home.
9 Q. And what did you and Stoddard say?
10 A. I told Rubbo that you better not be
11   touching their property, because you
12   could be videoed, as I walked passed him.
13 Q. What made you think that Rubbo might be
14   videoed?
15 A. Mr. Stoddard told me that we were being
16   videoed, when he was in the chair.
17 Q. When he was in the chair after he first
18   sat in the chair?
19 A. While all that was going on, him and I
20   were just talking just like we are now.
21   He said, You're probably being videoed.
22   So, I looked around the room and said,
23   Where's the video? He didn't answer me.
24   After I said, Where's the video, he

STODDARD V. SOMERS     CondenseIt™     RICHARD SOMERS 7/6/04

Page 29

1  didn't answer me.
2  Q. This discussion about the video is while
3      he's sitting in the chair?
4  A. That's correct.
5  Q. And is it before the time you said
6      he started to get out of the chair?
7  A. It would have been after. Everything
8      happened --
9  Q. I understand. We are splitting hairs
10     here, because it's a short period of
11     time.
12 A. Right.
13 Q. The best you recall is he's in the chair,
14     then he gets up. You tell him sit back
15     down. He sits back down. And sometime
16     after that he tells you you're being
17     videoed, or he said something about
18     that.
19 A. I would say that's how it would go.
20 Q. Did you have any conversations with any
21     of the officers about this arrest after
22     the arrest, say, within a month after the
23     arrest?
24 A. I'm trying to think. I'm not sure on

Page 30

1      that time frame or not.
2  Q. So, then let me just expand it, and ask
3      if you had any conversations with any
4      officers about this arrest afterward?
5         MR. CARLSON: I just want
6      to point out, don't describe any
7      conversation in which I was involved.
8  A. Basically when counsel was there.
9  Q. So, you can't recall any conversations
10     with Donnelly, Byers or Jackson
11     concerning this April 21st arrest --
12     since the April 21st arrest, is that
13     correct?
14 A. I'm not sure of the time frame, but I
15     remember Sergeant Jackson saying she was
16     trying to bite him, but I'm not sure
17     where that time frame was.
18 Q. What about any conversations with
19     superior officers after April 21st, 2000?
20 A. Sergeant Jackson is my superior officer.
21 Q. Other than Jackson, did you have any
22     conversation?
23 A. I don't believe so.
24 Q. Was there ever any IAD initiated about

Page 31

1      the April 21st event?
2  A. There was no report of any incident at
3      all.
4  Q. Did you ever have a discussion of the
5      April 21st arrest with Louis Rubbo?
6  A. I tried to avoid Mr. Rubbo and Mr.
7      Stoddard, because they're neighbors.
8      Just on that day I told them to be
9      careful. You could be videoed.
10 Q. At any time have you had any kind of
11     social relationship with Rubbo beyond
12     just, you know, you say hello to your
13     neighbor?
14 A. No, I've never.
15 Q. Over the lawn mower?
16 A. No, I've never been to a social function
17     with him.
18 Q. Same with Stoddard?
19 A. Same with Stoddard.
20 Q. At the time of April 21st, 2002, was
21     there anything unusual going on in your
22     life?
23 A. As far as?
24 Q. Having any family problems.

Page 32

1  A. No.
2  Q. Was your wife having some difficulty,
3      maybe some medical difficulties around --
4  A. She's been ill for years.
5  Q. And I hate to have to ask you about that
6      stuff, and I know you're not a doctor.
7      What's your understanding of the problem
8      she was having on April 21st? I'm
9      focusing on that date right now.
10 A. She was fine. She was working out in the
11     yard with me.
12 Q. But she had some underlying medical
13     condition?
14 A. She had a cancer before.
15 Q. And had that been treated and resolved by
16     April 21st?
17 A. Yeah, she was in remission.
18 Q. Are you still married today?
19 A. She's deceased.
20 Q. When did she pass on?
21 A. Two years ago this month.
22 Q. So, that would have been in June of 2000?
23 A. July 16th.
24 Q. July 16, 2002. And did she die of

Page 33

1  cancer?
2  A. No.
3  Q. What was the --
4  A. She committed suicide.
5  Q. I'm very sorry. Were there problems
6    with her in that way having depression
7    or mental anxiety?
8  A. Wait a minute.
9      THE WITNESS: Can I talk to
10   you?
11     MR. CARLSON: Finish the
12   question. If we could limit this as much
13   as possible.
14  Q. But we also understand that people who
15    are under this kind of duress, this kind
16    of strain can act differently than they
17    might ordinarily act.
18  A. She was fine on that date.
19  Q. On that day, but around that time was she
20    having depression or some mental problem?
21  A. Depression.
22     MR. SHARP: If you want to have
23   a talk, go ahead. Let's go off the
24   record.

Page 34

1      (Off the record.)
2      (Back on the record.)
3  Q. I don't want to go on about this longer
4    than I have to. I hope you understand I
5    have a job to do and I'm just doing it.
6  A. Okay.
7  Q. Is it fair to say that during April of
8    2002, your wife's health condition was
9    causing you some distress?
10  A. No more than usual -- the usual person.
11  Q. But you were distressed by it?
12  A. I don't know about then as much as other
13    times, no.
14  Q. Do you have children?
15  A. Two.
16  Q. How old were they at the time?
17  A. 25 and 23.
18  Q. And were they around the house at all?
19  A. My son lived with us here. No, he
20    didn't. It was between us and his
21    girlfriend.
22  Q. So, he was sometimes there?
23  A. Sometimes there and sometimes not.
24  Q. Could I ask your children's names?

Page 35

1  A. My daughter is Amy and my son is Steven.
2  Q. And Amy is the elder?
3  A. She's the senior, yes.
4  Q. Where does Amy reside now?
5  A. Abington.
6  Q. Do you know her address?
7  A. Bedford Street. No, it's not Bedford --
8    Washington Street. I think it's like
9    68. It's in the low numbers.
10  Q. And is it Amy Somers?
11  A. Amy Somers Quelly.
12  Q. How do you spell Quelly?
13  A. Q-u-e-l-l-y.
14  Q. So, she's like 27 now?
15  A. She's 27 -- no, 28. She just had a
16    birthday.
17  Q. And what was your son's name?
18  A. Steven with a V.
19  Q. And Somers, I assume.
20  A. That's correct.
21  Q. Do you know his current address?
22  A. 33 Wilson Street.
23  Q. So, he's living with you now.
24  A. No, he lives across the street. He

Page 36

1    didn't want to leave home too far, I
2    guess.
3  Q. Do you know whether he, or do you know
4    whether he, Steven, or Amy had any kind
5    of relationship ever with Rubbo?
6  A. Just to say hello as neighbors.
7  Q. Just the guy that lives down the street?
8  A. Just the guy that lives down the street.
9  Q. Same for Stoddard?
10  A. That's correct.
11  Q. Were Amy or Steven expressing to you any
12    great concern about their mother around
13    the time of April 21st?
14  A. I can't remember that, no.
15  Q. At some point during the entry of the
16    house on April 21st you told Stoddard,
17    We're tired of your fuckin' shit, right?
18  A. Either we're tired of your fuckin' shit
19    or I'm tired. I don't know how I said
20    it, one of those two.
21  Q. What fuckin' shit were you talking about?
22  A. Just going to the house all the time,
23    having cruisers there all the time.
24  Q. And you're not sure whether you said

Page 37

1    we're tired or I'm tired.
2  A. That's correct.
3  Q. How many times had you gone to the house
4     in response to a police dispatch?
5  A. Maybe once. I'm not sure. Like I said,
6     I tried to stay away. As a matter of
7     fact, the day that we were suppose to be
8     in court, shortly before that, I worked
9     a shift, my sector of town. I was
10    suppose to respond. I asked another
11    cruiser to go, just because it was my
12    neighborhood. You try not to go to
13    neighborhood calls.
14 Q. Are you saying that was before April
15    21st?
16 A. Recently. We try not to go to -- like if
17    you worked on the other side of town, it
18    was your street you lived on, I would
19    answer the call.
20 Q. You got somebody to cover for you.
21 A. Yeah.
22 Q. So, if you had only been there once on
23    a police dispatch, and you said, blank,
24    tired of your fuckin' shit, does it

Page 38

1.   make sense to you that you must have
2    said, We're tired of your fuckin' shit?
3  A. Again, I don't know whether I did or did
4     not.
5  Q. And assume for the moment that you said,
6     We're tired, that would have been in
7     reference to you and your police officer
8     colleagues, wouldn't it?
9          MR. CARLSON: Objection.
10 A. That's an assumption.
11 Q. Right. I understand.
12 A. Yeah.
13 Q. At depositions we get to ask questions
14    like that.
15 A. I don't know.
16 Q. But the fuckin' shit that you were
17    talking about was this constant calling
18    back and forth on each other.
19 A. Absolutely. The cruiser is always
20    there. Live on a dead-end street with
21    maybe ten or 12 houses on it.
22 Q. So, how many times, just as a neighbor
23    to Rubbo and Stoddard, how many times
24    did you become aware that, Oh, Jesus,

Page 39

1    the cruisers are down the street again?
2  A. Numerous. Everybody on the South Shore
3     with a scanner knows we've been there
4     numerous times.
5  Q. Did that --
6  A. A lot more than this pile.
7  Q. So, a lot more police presence at those
8     residences than is reflected in Exhibit
9     No. 1, right?
10 A. That's correct.
11 Q. How would that happen that a cruiser
12    would go there without having some type
13    of a dispatch?
14 A. Every time they dispatch, there would be
15    a log. It's in the log. They have to be
16    dispatched.
17 Q. So, if I understand you correctly, are
18    you telling me that there has to be a
19    lot more dispatch logs than the pile that
20    you've got sitting there in front of you
21    as Exhibit 1?
22 A. This doesn't seem like enough from --
23    well, this doesn't come back to now.
24    That's why.

Page 40

1  Q. It doesn't go back far enough, or it
2     doesn't come forward?
3  A. It doesn't come forward to the present.
4  Q. So, between the time that the first
5     cruisers started showing up and April 20,
6     2002, does this seem like --
7  A. I would have to go back in the log and
8     look, to be truthful. I don't know
9     exactly how many, but between then and
10    now there is numerous pages of them.
11 Q. Lots more police logs than this?
12 A. Correct.
13        MR. SHARP: Well, obviously I
14    would like to have those.
15 Q. Tell me about your use of force training
16    with the Rockland Police. Is that annual
17    in service?
18 A. We have in service; that's correct.
19 Q. When is the last time that you had a
20    none in service use of force course
21    or training of any sort?
22 A. 2003.
23 Q. And what about before April 21, 2002,
24    when would have been your last training,

Page 41

1    other than an in service?
2    A. The Police Academy.
3    Q. And that was?
4    A. 1984, I believe.
5    Q. Before you became full-time?
6    A. That's when I was in the Academy going
7       full-time.
8    Q. Is there a typical in-service training on
9       use of force at the Rockland Police
10      Department, or are they different every
11      year?
12   A. They're different.
13   Q. Can you describe those in-service
14      training courses?
15   A. Basically the ones that Rockland would be
16      shoot, don't shoot situation, basically.
17   Q. What about non-shooting use of force,
18      have you had any services?
19   A. They would talk about it at that
20      training.
21   Q. And you understand the concept obviously
22      of using escalating force in response to
23      escalating threat to the officer, right?
24   A. That's correct.

Page 42

1    Q. And how would you describe that yourself?
2    A. As far as?
3    Q. What is it?  What is it that an officer
4       is suppose to do?
5    A. Your mere presence is the first step.
6       Presence and verbal command would be the
7       same.
8    Q. And you would use that level of presence
9       or force in response to what kind of
10      situations?
11   A. Just about every situation you go to
12      would be your presence is there.  They
13      know you're a police officer.
14   Q. And then what's the next level?
15   A. Then would be -- hands on would be the
16      next and they changed it.  I'm not sure
17      exactly where they changed it.  OC would
18      be the next, but I kind of think they're
19      both the same now.  They changed it back
20      and forth a couple of times; so I'm not
21      sure where the OC and tactical come in.
22      There's escorts along with the hands-on.
23      That would be the second step up the
24      ladder.  Then it would go tactical all

Page 43

1    the way up to deadly force.
2    Q. What force situation did you perceive, as
3       far as Stoddard is concerned, when you
4       went into his house?
5    A. He was going to interfere with Arthur
6       Donnelly.  So, for his safety, I pushed
7       him out of the way.  Officer Donnelly's
8       safety, I pushed Stoddard out of the way.
9    Q. So, what level?
10   A. Two, my presence had already been
11      established.
12   Q. So, your response was a level 2 use of
13      force.
14   A. That's correct.
15   Q. And will you agree with me, and you don't
16      have to agree that you struck him, okay.
17      I understand you don't agree with that.
18      Would you agree with me that striking
19      somebody in the face would not be an
20      appropriate use of level 2 force?
21         MR. CARLSON: Objection.
22   A. They've changed it last year that you can
23      strike, but I think it's on level 3.  I'm
24      not 100 percent sure whether it's 2.  I'm

Page 44

1    not sure.
2    Q. I'm talking about now April 21st, 2002,
3       on that date would you agree with me that
4       striking someone in the face would not be
5       an appropriate application of level 2
6       force?
7         MR. CARLSON: Objection.
8    A. If they were a threat to you, aggressive
9       threat, the key would be aggressive
10      threat, you could.
11   Q. But you didn't perceive Stoddard as
12      an aggressive threat, did you?
13   A. Once I pushed him out of the way, he
14      wasn't an aggressive threat until he
15      started to get up again.  He was a little
16      more aggressive.  I took that as an
17      agression again.  That would be his
18      second agression.  I told him to stop,
19      stay where he was.
20   Q. When you first entered the house and
21      saw Stoddard take a step or two toward
22      Donnelly, as you've testified, are you
23      saying today that you perceived him as
24      an aggressive threat?

Page 45

1  A. I would say that it was a threat towards
2     Officer Donnelly's safety. He was in the
3     immediate area of the arrest.
4  Q. But I'm asking you a somewhat more
5     pointed question. Did you regard him as
6     an aggressive threat to Officer Donnelly?
7  A. I perceived him as a threat to Officer
8     Donnelly at that time.
9  Q. Are you avoiding the word aggressive, or
10    what am I missing here?
11  A. No, I'm not avoiding the word. That's
12    how I perceived him at that time.
13    He was a threat to Officer Donnelly.
14    He's stepping towards Officer Donnelly.
15    Officer Donnelly is trying to make an
16    arrest. I perceived that as a threat.
17  Q. Did you perceive that as such a threat
18    that striking Stoddard in the face would
19    be an appropriate response to that
20    threat?
21  A. I did not strike Stoddard in the face. I
22    pushed him. That was my response to that
23    situation. I used enough force to stop
24    his forward motion.

Page 46

1  Q. I understand that you say you didn't hit
2    him in the face. I understand that. I'm
3    asking you if you perceived him as such
4    a threat that striking him in the face
5    would have been an appropriate response?
6  A. My reaction was, and it's the answer
7    to your question that the push was
8    sufficient to stop his forward progress,
9    and he was no longer a threat at that
10    time. That's my answer to the question.
11  Q. Let me try it one more time.
12  A. I don't know what to say.
13  Q. Did you perceive him as sufficiently
14    threatening that striking him in the face
15    would have been an appropriate response
16    to what he was doing, when you saw him
17    moving toward Officer Donnelly?
18  A. My appropriate response was correct at
19    that time. I pushed him away, and I did
20    not have to punch him, because when I
21    pushed him away, he stopped. There was
22    no need to punch anybody, or do anything
23    else different than to push him away.
24  Q. Now, you're aware that there's now a

Page 47

1    new dispute, a new chapter in the
2    Rubbo/Stoddard history with Stoddard
3    accusing Rubbo of assault and battery
4    with a deadly weapon.
5  A. Okay.
6  Q. The brick thing.
7  A. Somewhat familiar with it.
8  Q. What is your familiarity with the brick
9    thing?
10  A. I don't know how the sequence worked,
11    whether Stoddard went to the police
12    station first or to the courthouse
13    first. At the courthouse he tried to
14    take charges out on Rubbo. They directed
15    them to myself, because I was the
16    prosecutor. So I said, We need a
17    report. I can't do anything without
18    a report.
19  Q. This is what you said to Stoddard?
20  A. That's correct. So, very professional,
21    we were both cordial. Like I said, we
22    were cordial after the arrest even. So,
23    I said, Let's go down to the DA's office,
24    because they would handle it anyway.

Page 48

1    Because it's assault and battery with a
2    dangerous weapon, they would handle it.
3  Q. This is taking place at the Hingham
4    District Court?
5  A. That's when I became aware.
6  Q. That's when you first became aware?
7  A. That's correct, through Mr. Stoddard
8    himself.
9  Q. Because you were on duty that day?
10  A. As the prosecutor. I'm assigned to
11    Hingham Court now. I wasn't sure
12    whether he had already been to the police
13    station, or he took my advice. I don't
14    know how that sequence worked from
15    there. They said that he, indeed, did
16    need a report. So, I directed him back
17    to the police station to file a report.
18       Also at that time he approached
19    me and said, If you drop the criminal
20    case against me, I will drop the suit
21    against you. I said, Wait a minute,
22    George. I'm dealing with you in a
23    professional manner. You have a lawyer
24    and I have an attorney. We'll let the

**Page 49**

1    attorneys talk it over. Whether he went
2    to the police station after that, like I
3    said, I don't know the sequence which one
4    he went to first.
5  Q. And you're aware that at this point there
6    are ABDW charges against Ruffo?
7  A. I signed the complaints. That's my job.
8  Q. Have you now described all the contact
9    that you have had with Stoddard about
10    the charges against Rubbo?
11  A. With Mr. Stoddard, that's correct.
12  Q. Yes?
13  A. Yes.
14  Q. As far as the brick thing?
15  A. Absolutely.
16  Q. Now, did you have any contact with Rubbo
17    about the brick thing?
18  A. He was walking down the street and
19    mentioned something. I told him that
20    there were charges taken out on him for
21    that. That was the only conversation
22    about that that I had with him.
23  Q. But I think you said you signed the
24    complaint.

**Page 50**

1  A. I signed the complaint, yes.
2  Q. So, what was your understanding about
3    the Commonwealth versus Rubbo, when you
4    signed the complaint?
5  A. I don't understand what you're getting
6    at.
7  Q. You didn't have any conversation with
8    Rubbo --
9  A. No.
10  Q. -- about the brick incident --
11  A. No.
12  Q. -- when you signed the complaint?
13  A. No, I did not.
14  Q. So, where did you get your information?
15  A. I got it from Mr. Stoddard, and then
16    a police report was generated with a
17    complaint and I signed the complaint,
18    assault with a brick against Stoddard,
19    assault and battery with the car, or the
20    truck, or whatever he had, pickup truck.
21  Q. So, you're signing of the complaint
22    against Rubbo was based on a police
23    report?
24  A. That's correct. Every time I sign a

**Page 51**

1    complaint, they're based on a police
2    report.
3  Q. Did you have any conversation with the
4    officer who generated the police report
5    about Rubbo, as far as the brick thing is
6    concerned?
7  A. I think it's Officer Zielinski. He said
8    he took complaints out against both of
9    them.
10  Q. But did he say anything about what Rubbo
11    told him?
12  A. Not really. He just said when he talked
13    to them, they both didn't want to take
14    charges out on each other, but he felt
15    it was best to take the charges out.
16  Q. In some initial disclosures that your
17    attorney provided in this federal
18    lawsuit -- that's one of the things
19    that we do -- there are some individuals
20    listed, who might have information
21    pertinent to this case. Do you know
22    who Fred Lockhart is?
23  A. He lives right across the street from
24    Stoddard.

**Page 52**

1  Q. And do you have any idea what information
2    he's suppose to have about this case?
3  A. He could say that Stoddard and I had
4    conversation outside the house.
5  Q. Do you have any reason --
6  A. I think he was standing there the whole
7    time that whole incident took place.
8  Q. Do you have any reason to believe that
9    he could see inside the house?
10  A. No.
11  Q. Do you think he could not see inside the
12    house?
13  A. I don't know whether he did or not.
14  Q. And what about Officer James Simpson, did
15    he have anything to do with the arrest?
16  A. I don't know if he came, maybe a
17    transport. I don't know. I really don't
18    know.
19  Q. And how about Officer Ronald Ever, do you
20    know if he had anything to do with the
21    arrest?
22  A. He was the dispatcher at the time.
23  Q. On April 21st?
24  A. I believe that's correct. He would have

Page 53

1   been the dispatcher. Simpson could have
2   been too, though. They both could have
3   been in there. I'm not sure where
4   Simpson comes into play.
5 Q. Do you have any idea what the name of
6   the driver for All-Make towing was?
7 A. No, I don't know him. I never even heard
8   of the tow company.
9      (Off the record.)
10      (Back on the record.)
11      MR. SHARP: Let's mark this as
12 Exhibit No. 2.
     (Plaintiff's Exhibit No. 2,
13 Photograph, marked for identification.)
14
15 Q. I'll ask you, Officer Somers, if you
16   recognize what that is portraying?
17 A. It looks like Mr. Rubbo's pickup truck
18   and Miss Kelly's truck.
19 Q. Kelly's is the black one?
20 A. Correct.
21 Q. And the guy in the background is Officer
22   Direnzo?
23 A. Direnzo.
24 Q. What do you know, if anything, of Officer

Page 54

1   Direnzo's relationship with Rubbo and
2   Stoddard?
3 A. I would say he has no relationship at
4   all.
5 Q. And do you know him to be friendly with
6   Rubbo?
7 A. No. He's the same demeanor with
8   everybody. He's a friendly guy.
9      MR. SHARP: This Exhibit 3.
     (Plaintiff's Exhibit No. 3,
10 Photograph, marked for identification.)
11
12 Q. Exhibit 3, you would agree with me that's
13   just a closer view of Exhibit 2, and with
14   Direnzo out of the picture, right?
15 A. That's correct.
16      MR. SHARP: Let's mark this.
     (Plaintiff's Exhibit No. 4,
17 Photograph, marked for identification.)
18
19 Q. How would you describe Exhibit No.)4?
20 A. That's Mr. Rubbo's truck in front of his
21   driveway.
22 Q. And you see that Rubbo's truck is
23   blocking access to what you might think
24   is George Stoddard's driveway, correct?

Page 55

1 A. That's not a driveway. It's just a part
2   that goes between the houses. He doesn't
3   have garage or anything.
4 Q. A parking area?
5 A. Up until Miss Kelly came, he never parked
6   his car there. He always parked it on
7   the opposite side of the house, or on the
8   street. Looking at the house, it would
9   be way to the left over here.
10 Q. Way to the?
11 A. His house would be -- looking at.
12 Q. From the front.
13 A. Looking at his is straight on.
14 Q. His truck in Exhibit No. 4 is pointing
15   toward his house, right?
16 A. Yeah, that's correct. More or less,
17   that's correct.
18 Q. More or less?
19 A. That's correct.
20 Q. And you say that Rubbo never parked that
21   way.
22 A. No. Stoddard, you said it would be
23   blocking his driveway. There is no
24   driveway. The question was Stoddard

Page 56

1   usually parks his car over here. That's
2   what I thought you meant. I'm sorry, I
3   misunderstood.
4 Q. Stoddard parked his car elsewhere.
5 A. Over here this side of his house. I
6   misunderstood what you were talking
7   about.
8      MR. SHARP: Let's mark this.
9      (Plaintiff's Exhibit No. 5,
  Photograph, marked for identification.)
10
11 Q. That's Deborah Kelly's truck in
12   Stoddard's parking area, right?
13 A. Like I said, I don't know. They usually
14   park on the street this way. They park
15   with the street, Stoddard and Kelly
16   usually always parked with the street.
17 Q. And before Deborah Kelly came on the
18   scene --
19 A. Correct.
20 Q. -- whenever that was, did you ever
21   observe Rubbo to park his truck the
22   way it's portrayed in Exhibit No. 4?
23 A. No, not that I can say.
24 Q. You might notice; you might not.

|  | Page 57 |
|---|---|

1   A.  Correct.

2   Q.  After Deborah Kelly showed up on the

3      scene, did you ever see Rubbo park his

4      truck in the way that's depicted on

5      Exhibit No. 4?

6   A.  Once in a blue moon, maybe. I have seen

7      it on the street, yes, instead in the

8      driveway like that picture, but how many

9      times I could not tell you.

10      MR. SHARP: Let's mark Exhibit

11      No. 6 and Exhibit 7.

       (Plaintiff's Exhibit No. 6,

12      Photograph, marked for identification.)

13      (Plaintiff's Exhibit No. 7,    )

14      Photograph, marked for identification.)

15   Q.  In Exhibit 6 we have a photograph of

16      a lot of snow and somebody apparently

17      talking to a police officer. Do you

18      have any idea who that is talking to

19      the police officer, and who the police

20      officer is?

21   A.  I can't make out a face.

22   Q.  You don't have any idea who it is?

23   A.  No, I can't make it out.

24   Q.  That's fine. In Exhibit 6 there is

|  | Page 58 |
|---|---|

1      somebody depicted there in a blue jacket

2      of some sort. Do you have any idea who

3      that is?

4   A.  That's the little boy that used to live

5      across the street from me. His last name

6      is Bates.

7   Q.  Bates?

8   A.  Yeah. They don't live there anymore.

9      I don't know where they live. They've

10      moved since.

11   Q.  Did you ever observe somebody staking

12      out the property, I mean driving stakes,

13      doing a survey of the Rubbo or Stoddard

14      property?

15   A.  I'm not sure if they were doing it

16      for the water across the street from me.

17      That's not adjacent to them. I don't

18      know.

19   Q.  Did you ever observe Rubbo prevent

20      someone from laying out stakes?

21   A.  No.

22   Q.  When you first saw Stoddard, when you

23      entered the house on April 21st, 2002,

24      did he have any cuts on his face?

|  | Page 59 |
|---|---|

1   A.  Not that I remember. I believe not.

2   Q.  You described a conversation that you

3      had with Stoddard right after Kelly was

4      arrested.

5   A.  Well, he said he thought that she did

6      strike Donnelly with the bumper of the

7      truck. He told me that.

8   Q.  Anything else?

9   A.  Just small talk. That's all.

10   Q.  Just beyond that it was small talk.

11   A.  Small talk, correct.

12   Q.  And I think you said you had one other

13      conversation with Stoddard about this

14      brick thing.

15   A.  That's correct.

16   Q.  Have you had any other conversations

17      with Stoddard since April 21st, 2002

18      involving Rubbo, or the arrest of Deborah

19      Kelly, or the land dispute?

20   A.  No, not that I can remember.

21      MR. SHARP: I think that's it

22      for me.

23      MR. CARLSON: No questions.

24      (Whereupon deposition concluded

|  | Page 60 |
|---|---|

1      ERRATA SHEET

2   CHANGES TO THE DEPOSITION OF:

3

4   INSTRUCTIONS TO WITNESS: 1) Please note

5   any desired corrections to your testimony

6   by page and line number. 2 ) Enter text

7   as it appears in the transcript. 3)

8   Enter text as it should appear.

9

10   PAGE    LINE      SUGGESTED CORRECTION

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**STODDARD V. SOMERS**    CondenseIt™    **RICHARD SOMERS 7/6/04**

---

Page 61

1    SIGNATURE PAGE

2

3

4

5

6    I,              , do

7    hereby certify that I have read the

8    foregoing transcript of my testimony, and

9    further certify that said transcript is a

10    true and accurate record of said

11    testimony.

12

13

14

15    Dated at        , this

16    day of        , 2003

17

18

19

20

21

22

23

24

---

Page 62

1    COMMONWEALTH OF MASSACHUSETTS

2

3    Norfolk, ss.

4

5    I, JUDITH R. SIDEL, a Registered

6    Professional Reporter and Notary Public,

7    in and for the Commonwealth of Massachusetts,

8    do hereby certify that:

9    RICHARD SOMERS, the witness

10    whose deposition is hereinbefore set

11    forth, was duly sworn by me and that such

12    deposition is a true and accurate record

13    to the best of my knowledge, skills and

14    ability, of the testimony given by such

15    witness.

16    IN WITNESS WHEREOF, I have

17    hereunto set my hand and affixed my

18    Notarial Seal this 12th day of August

19    2004.

20

21        JUDITH R. SIDEL

22        NOTARY PUBLIC

23    Commission expires:

24    June 5, 2009.

---

**SIDEL COURT REPORTING SERVICES (781) 449-2351**    Page 61 - Page 62